412 February 8, 2018 No. 6

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of J. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*

*v.*

A. B.
*Petitioner on Review.*

(CC J150426; CA A161125; SC S064812)

On review from the Court of Appeals.*

Argued and submitted November 7, 2017.

Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the brief was Shannon Storey, Chief Defender.

Inge D. Wells, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Nakamoto, Flynn, and Nelson, Justices, and Shorr, Judge of the Court of Appeals, Justice pro tempore.**

WALTERS, J.

The decision of the Court of Appeals is affirmed.

_____
\* On appeal from Washington County Circuit Court, Ricardo J. Menchaca, Judge. 283 Or App 907, 389 P3d 409 (2017).

\*\* Landau, J., retired December 31, 2017, and did not participate in the decision of this case. Duncan, J., did not participate in the consideration or decision of this case.

**WALTERS, J.**

When a parent appeals from a jurisdictional judgment making the Department of Human Services (the department) the legal custodian of the parent's child and that wardship is subsequently terminated, the department may file a motion to dismiss the appeal as moot. In this case, we conclude that termination of such a wardship does not necessarily render the appeal moot; whether dismissal is appropriate will depend on the particular circumstances presented. If a parent identifies practical effects or collateral consequences that the parent believes will result from the judgment, then the department has the burden to persuade the appellate court that those consequences are factually incorrect or legally insufficient. The burden is on the department to prove that a jurisdictional judgment will have no practical effect on the rights of the parties and is therefore moot. In this case, we conclude that the department met that burden. The decision of the Court of Appeals is affirmed. *Dept. of Human Services v. A.B.*, 283 Or App 907, 389 P3d 409 (2017).

### FACTS AND PROCEDURAL HISTORY

We take the facts from the uncontested juvenile court records and the express findings of the juvenile court.

In 2005, the child who is the focus of this proceeding was born. He has an autism spectrum disorder, developmental delays, including speech delays, and other significant health issues.

In 2010, when the child was five years old, his mother and father divorced. Mother had been his primary caretaker, and she was awarded sole legal custody.

In 2015, when the child was 10 years old, the department investigated reports that mother was neglecting the child's basic needs and risking his safety by allowing him to have contact with her significant other, L. The department issued a "founded disposition" based on its administrative determination that mother had neglected the child through a "[l]ack of supervision and protection." The department then filed a petition to obtain dependency jurisdiction over

the child and, in allegations A through I, set out specific conditions and circumstances pertaining to both mother and father that, the department alleged, endanger the child's welfare.

Mother contested jurisdiction, and a trial was held based on documentary exhibits submitted by the parties. On August 28, 2015, the juvenile court issued a letter opinion. At the outset, the court stated that the case posed "a unique and challenging set of circumstances" because of the child's autism diagnosis and the fact that he is nonverbal. The court also noted that the child "is extremely attached" to mother. After reciting certain other factual findings, the court directed that three of the allegations in the petition—allegations A, B, and I—be amended. The court concluded that those allegations, as amended, had been proved. The court also concluded that a fourth allegation—allegation G—had been proved; it dismissed the remaining allegations.

Allegation A was directed to mother's conduct. As amended, it read: "The mother is aware that her domestic partner has a conviction for a sex offense, has threatened to kill her and her child, has engaged in a pattern of violent, threatening and mentally unstable behavior that presents a threat to [the] child's safety because the mother continues to allow him in the home and around the child." The court sustained that allegation based on the following findings: L had been convicted of rape in 1992. In December 2014, mother had applied for and obtained a restraining order against L alleging that he had made threats to kill her and her child. Police reports indicated that, around that time, L had thrown a brick at mother's door. And, in June 2015, L had left at least two threatening voice mail messages with the department.

Allegations B and G also were directed to mother's conduct. As amended, allegation B read: "The child is in need of therapeutic treatment that the mother has failed to provide." Allegation G alleged that mother "failed to provide for the educational needs of the child." The court sustained both allegations based on the following findings: The child has autism and a severe developmental language delay for which treatment is medically necessary. Mother participated

in a speech therapy evaluation in January 2014 and therapists recommended a 12-month treatment regimen at two- to three- times per month. Although mother and her child attended a couple of appointments in January and February 2014, there was no evidence that mother was following through, creating a risk of harm that the child's therapeutic needs were not being met. Mother was home schooling the child and was enrolled with the home school program in Multnomah County. However, mother had recently moved to Washington County, and there was no evidence that the child was enrolled in an educational program there. Mother worked with a non-profit organization and agreed to have a developmental disabilities service worker come to the home once a month. There was no evidence to suggest that mother was following through with the child's speech therapy, and the child's current home schooling/educational posture was unknown.

Allegation I pertained to father. As amended, it alleged that father "is willing to be a custodial resource, but does not have sole legal custody of the child and is unable to protect him from the mother's abusive and neglectful behaviors." Father admitted that allegation.

Based on its letter opinion, the juvenile court entered an amended, corrected judgment *nunc pro tunc* on September 9, 2015, finding the child to be within the jurisdiction of the court. The court committed the child to the legal custody of the department for in-home placement with mother, pursuant to a safety plan. The court ordered the department to conduct three unannounced home visits in the next 90 days, noted its expectation that the department would be making the personnel decisions with respect to in-home care providers, and set a permanency hearing for June 6, 2016.

Mother appealed to the Court of Appeals, arguing that the evidence was insufficient to support the juvenile court's jurisdictional findings. While her appeal was pending, on March 23, 2016, the juvenile court entered what it labelled a "permanency judgment." The court found that mother had cooperated and worked with the department; that mother "is a minimally adequate parent"; that the

department had noted no safety concerns with mother; that mother had actually benefitted from departmental intervention; and that she had the child working with developmental disability services, "which will continue." The court concluded that no further review was necessary and ordered that the "petition [be] dismissed."

	In the Court of Appeals, mother's attorney filed a notice of probable mootness under ORAP 8.45[1] informing the court of the juvenile court's decision to end the wardship. The Appellate Commissioner dismissed mother's appeal, but mother petitioned for reconsideration. In an affidavit filed with her petition, mother averred that she had not known of her attorney's notice of probable mootness and stated that, as a result of the court's jurisdictional judgment, she had suffered and would suffer what she deemed to be collateral consequences. In her affidavit, mother stated that the following consequences had occurred or would ensue:

1.	Her ex-husband had stopped paying child support "while DHS was investigating" her, and he had made only one small payment since that time. He had told her that he did not feel he should have to pay child support because she is a neglectful parent.

2.	When it entered the permanency judgment, the juvenile court had advised her ex-husband to "go across the street and file against [her] in family court," and it advised his court-appointed attorney to show him how to do that. Having a founded case of child neglect on her record would more than likely count against her in any child custody cases that happen in the future.

3.	When she was a minor, 25 years earlier, there was a founded case of child neglect against her, and, with the new case of neglect on her record, it would make it appear as if she were a long-term neglectful parent and have an impact on any future DHS investigation.

---

[1] "Except as to facts the disclosure of which is barred by the attorney-client privilege, when a party becomes aware of facts that probably render an appeal moot, that party shall provide notice of the facts to the court and to the other party or parties to the appeal, and may file a motion to dismiss the appeal." ORAP 8.45 (footnote omitted).

4.  Five years before she signed her affidavit, she had applied and passed a background check for a volunteer position. With a founded child neglect disposition, she is no longer qualified for that position.

5.  She will be barred from any future employment that involves working with children, such as foster parenting, in-home child care, or working as an educational assistant.

6.  There is intense social stigma "that goes along with being involved with DHS." During the time that DHS showed up at her door, she was the victim of harassment by her property managers, and her neighbors refused to talk with her or her child. She is constantly concerned with what others will think if they should find out about the founded allegations, and she no longer feels comfortable visiting her son's providers who were contacted by DHS against her wishes. She also is very embarrassed about the friends and family who were consulted by DHS.

The department did not respond to mother's petition for reconsideration, and the Appellate Commissioner granted reconsideration of the order of dismissal and reinstated mother's appeal. The department revived the issue of justiciability in its answering brief, requesting dismissal of mother's appeal as moot. Mother argued otherwise, advancing the same concerns that she had identified in her petition for reconsideration before the Appellate Commissioner. The Court of Appeals agreed with the department and dismissed mother's appeal. *A.B.*, 283 Or App at 908. The court issued a per curiam opinion stating that a "written discussion of the competing arguments would not assist the parties, bench, or bar." *Id.* The court said that it was "not persuaded that the circumstances establish the kind of collateral consequences that prevent this appeal from being moot." *Id.* Mother then filed a petition for review in this court, which we allowed.

## ANALYSIS

"Determining mootness is one part of the broader question of whether a justiciable controversy exists." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993).

One question in that analysis is "whether the interests of the parties to the action are adverse." *Id.* Another question in that analysis, the question at issue here, is whether "the court's decision in the matter will have some practical effect on the rights of the parties." *Id.*

Although the parties differ in their views about how that practical effect is determined, they start with the mutual understanding that there is at least one circumstance in which a categorical rule is appropriate. The United States Supreme Court has held that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York*, 392 US 40, 57, 88 S Ct 1889, 20 L Ed 2d 917 (1968). Mother contends that a similar rule should apply for juvenile court determinations that a child is within its jurisdiction. She asserts that, like a criminal conviction, a judicial determination of parental unfitness will have significant legal consequences and is inherently stigmatizing. Therefore, mother advocates for a rule that, when a wardship is terminated, the jurisdictional judgment is moot only if the department shows that there is no possibility that any collateral legal consequences will be imposed.

The department takes the opposing view. It contends that, unlike criminal records, juvenile court records are confidential. And, it argues, a jurisdictional judgment lacks the direct, adverse legal consequences that a criminal conviction may impose. As a result, the department contends, the same presumption of collateral consequences should not apply. According to the department, when a juvenile court terminates its jurisdiction and wardship, an appeal of the underlying jurisdictional judgment ordinarily will be moot. The department argues that the burden is on the parent to "establish that non-speculative collateral consequences render her appeal justiciable."

This is not the first time that this court has addressed the question of mootness in this context. In *Dept. of Human Services v. G.D.W.*, 353 Or 25, 32, 292 P3d 548 (2012), this court considered whether a father's appeal of a jurisdictional judgment was rendered moot when the juvenile

court entered a subsequent order releasing his children from its jurisdiction. The court recognized that the remedy to which the father ordinarily would be entitled—reversal and remand for a new jurisdictional hearing—was not available because the juvenile court had determined that the father's children "no longer needed its protection." *Id*. However, that did not necessarily render the father's appeal moot. *Id*. The juvenile court had found that father had sexually abused one of his children and had incorporated that finding into its judgment. *Id*. As a result, the court reasoned, the father's appeal was not moot. *Id*. The court agreed with the father that the finding and judgment "can have real and adverse effects on [the] father, and that those adverse effects may be prevented if the findings are judicially overturned." *Id*.

The potential adverse effects on which the court relied on *G.D.W.* were threefold. First, the court said, the state could more easily terminate the father's parental rights to the children over whom the court had taken jurisdiction, as well as "any other children he might have in the future."[2] *Id*. Second, the court noted, the circuit court had awarded sole custody of the father's children to their mother, with no parenting time to the father. *Id*. at 31. The court explained that that decision likely was premised on the juvenile court's findings and that, if those findings and the resulting judgment were to be vacated, the "father's ability to reopen the custody and parenting time judgment might be positively affected." *Id*. at 32. Third, the court considered the social stigma that the father suffers as a result of the judicial findings to be significant. *Id*. Although the court allowed that that stigma might not be sufficient by itself to preclude mootness, it cited that stigma as an example of collateral consequences that could follow from the jurisdictional judgment that the father was challenging on appeal. *Id*.

Thus, in *G.D.W.*, this court did not adopt a presumption favoring either the father or the department. Instead,

---

[2] The court cited ORS 419B.502 for that proposition. *Dept. of Human Services v. G.D.W.*, 353 Or 25, 32, 292 P3d 548 (2012). ORS 419B.502 provides that the rights of a parent may be terminated without any effort by a social service agency to help the parent adjust his or her conduct if the court finds that the parent is unfit by reason of a single incident of "extreme conduct toward any child."

the court explored both how the termination of the wardship would affect the relief available to the father on appeal and the father's argument that, unless the judgment were reversed, he would suffer other collateral consequences. Mother does not disagree with that analysis, but, as indicated, urges us to adopt a more categorical rule that would eliminate the need for a parent to make the arguments that the father made in *G.D.W.*

Mother begins by explaining that parents have a fundamental liberty interest, under the Due Process Clause of the United States Constitution, in the care, custody, companionship, and control of their children. *Stanley v. Illinois*, 405 US 645, 651, 92 S Ct 1208, 31 L Ed 2d 551 (1972). Mother argues that the department is prohibited from interfering with that interest unless parents fail to provide even minimally adequate care. As a result, mother asserts, a departmental finding of "unfitness" confirmed in a juvenile court judgment will have legal ramifications comparable to those that arise from a criminal conviction, including the following: (1) as long as a jurisdictional judgment stands, it may be judicially noticed in other actions involving the child and could make it more likely that a juvenile court would again assert jurisdiction in the future or that a court would consider it in subsequent custody or visitation proceedings. ORS 107.137(1)(e) (conferring on a child's primary caregiver a preference for sole legal custody as long as the caregiver is "fit"); ORS 109.119(2)(a) (entitling parent to presumption that the parent acts in the best interest of child when faced with a third-party custody or visitation action); (2) a jurisdictional judgment precludes a parent from challenging an underlying administrative determination—such as a "founded" disposition—that the parent abused or neglected her child. *See* OAR 413-010-0722(1) (department will not conduct an administrative review of a founded disposition "when there is a legal finding consistent with the [Child Protective Services] founded disposition"). Mother contends that a "founded" disposition may disadvantage the parent in a future departmental investigation or limit the parent's employment or volunteer opportunities. Mother cites for support ORS 419B.035(3) (authorizing the department to make available its records

if necessary to administer its child welfare services); OAR 413-015-0212 (requiring employees to consult Child Protective Services supervisor in certain situations); OAR 407-007-0210(8) (listing individuals subject to an "abuse check" by the department); OAR 407-007-0290(11) (a) (identifying prior abuse and neglect investigations as "potentially disqualifying abuse" that can prevent parents from serving as a foster care provider); and OAR 407-007-0410(5)(e),(f) (permitting the department to conduct "abuse check" of certain volunteers and employees).

Mother contends that it is only when a court reverses a jurisdictional judgment of unfitness that a parent is vindicated and safeguarded from those adverse consequences; a judicial ruling terminating a wardship does not have that effect. According to mother, a ruling terminating a wardship is nothing more than an acknowledgement that the circumstances requiring the assertion of jurisdiction are no longer present. It is not an indication that there was no basis for assertion of jurisdiction in the first place.

Although mother recognizes that there may be some circumstances in which the termination of a wardship will render a parent's appeal moot, mother contends that those circumstances are few. For instance, mother suggests, if a parent challenges only the juvenile court's disposition and not its assertion of jurisdiction, a subsequent order terminating the wardship would render the parent's appeal moot. Or, mother recognizes, when a parent has been criminally convicted based on the same conduct that is the basis for assertion of jurisdiction and does not appeal the conviction, the parent's appeal of the jurisdictional judgment may be moot. In that circumstance, notwithstanding whether the jurisdictional judgment is reversed, the conviction may impose the same collateral consequences as the jurisdiction judgment, and thus the jurisdictional appeal may have no practical effect on the rights of the parties. However, mother contends, in the ordinary circumstance, a jurisdictional judgment will have significant legally imposed consequences and those consequences should persuade us to adopt a categorical rule permitting an appeal to proceed unless the department proves the existence of extraordinary circumstances.

The department responds that the legally imposed consequences of a criminal conviction are different in nature from the consequences that mother identifies. The department points out that a criminal conviction can, by virtue of the conviction itself and without consideration of any mitigating circumstances, have specified legal consequences. For instance, a criminal conviction can make an individual ineligible to serve as a juror, prohibit an individual from possessing a firearm, and subject an individual to greater punishment or deportation. ORS 10.030(3)(a)(E) (person with felony conviction ineligible to serve as a juror in criminal trial); ORS 166.270(1) (making it a crime for a felon to possess a firearm); ORS 40.355 (permitting a witness to be impeached by evidence of conviction of certain crimes); ORS 813.010(5)(a) (certain prior convictions elevate driving under the influence to a felony); ORS 137.719(1) (presumptive life sentence for multiple sex crime convictions); 8 USC § 1227(a)(2) (certain criminal convictions render noncitizen deportable). According to the department, the legal consequences that arise from entry of a jurisdictional judgment do not have a similar effect. A founded disposition or jurisdictional judgment may be a factor in further legal proceedings or decisions about whether a parent will obtain employment or volunteer positions, but neither requires a particular adverse decision or triggers an automatic prohibition.

Although we recognize that there are some findings, such as the findings of sexual assault in *G.D.W.*, that have consequences comparable to those that accompany a criminal conviction, we agree with the department that not all findings of "unfitness" are of that nature. At the same time, we also recognize that, even if the law does not impose specific automatic consequences, findings of unfitness may have an adverse effect on future legal proceedings or on parents' employment or volunteer opportunities. We do not discount the practical barriers that a parent who has been judged "unfit" may face, and they may render an appeal justiciable in a particular case. However, we do not see those barriers to be so insurmountable or universal that they persuade us to adopt the categorical rule for which mother contends.

We turn, therefore, to mother's contention that the social stigma that accompanies such a judgment justifies

a categorical rule. Mother notes that, in civil commitment appeals, the Court of Appeals has adopted the view that the stigma that arises from an order of civil commitment is a sufficiently material consequence to preclude mootness, notwithstanding the expiration of the period of commitment. *State v. Linde*, 179 Or App 553, 555, 41 P3d 440 (2002); S*tate v. Van Tassel*, 5 Or App 376, 385, 484 P2d 1117 (1971).[3] Mother asks that we adopt the same view here.

Making a determination that juvenile court jurisdictional judgments are inherently stigmatizing would require us to draw conclusions about how society functions. We have not always been consistent in our approach to such issues. For instance, in deciding how a "reasonable person" would act in a particular circumstance, we have relied on our own experience and judgment. *See, e.g.*, *State v. Backstrand*, 354 Or 392, 412-13, 313 P3d 1084 (2013) (using experience and judgment to determine whether "reasonable person" would believe officer's questions intentionally and significantly restricted liberty). We also have taken judicial notice of settled social science data to provide us with legislative facts relevant to our analyses. *See, e.g.*, *State v. Lawson/James*, 352 Or 724, 740, 291 P3d 673 (2012) (taking judicial notice of data as legislative facts in deciding standard for admissibility of eyewitness testimony).

In this case, we understand mother to be asking that we take the former approach: Mother seems to ask that we use our experience and judgment to conclude that a "parental unfitness determination discredits and undermines the parent in her protected relationships with her child and other family members, [and] stigmatizes the parent with her child, childcare workers, school personnel, neighbors, and others." Mother explains that "[c]hild neglect and abuse investigations necessarily involve interviews and information sharing and gathering with individuals familiar with the family" and that those persons "necessarily become aware" of any resulting jurisdictional judgment. Most profound, mother asserts, is that a judicial

---

[3] Mother also notes that this court has accepted review in *State v. K. J. B.*, 360 Or 851, 389 P3d (2017), a civil commitment case. In *K. J. B.,* this court is being asked to adopt the Court of Appeals approach to mootness.

determination of parental unfitness discredits and undermines the parent in relationships with immediate family members and may incite them to infringe on the existing parent-child relationship.

There is no disputing the primacy of the parent-child relationship and the importance of those bonds. But, we are not convinced that every action that the department takes to protect children will be accompanied by significant social stigma. As the department points out, unlike criminal convictions, jurisdictional judgments are not a matter of public record. *Compare Delehant v. Board on Police Standards*, 317 Or 273, 280, 855 P2d 1088 (1993) ("Criminal records that are not expunged are there for all to see."), *with* ORS 419A.252(4)(f) and ORS 419A.255(1)(b) (making the "record of the case," which includes "[o]rders and judgments of the court," confidential and providing that it "shall be withheld from public inspection[.]"). Although mother is correct that there are numerous exceptions to that prohibition, *see* ORS 419A.255(1)(b), ORS 419B.035(1) (providing exceptions), the general rule of confidentiality provides parents with some protection against social stigma that individuals convicted of crimes do not have.

In addition, the findings necessary to a jurisdictional judgment are not equally stigmatizing. For instance, in this case, the department alleged that father "is willing to be a custodial resource, but does not have sole legal custody of the child and is unable to protect the child from the mother's abusive and neglectful behaviors." Father admitted that allegation, and it was one of the bases for the juvenile court's assertion of jurisdiction over the child. That kind of finding is quite different than a finding that an individual has violated the law, and we would be hard pressed to consider that kind of finding to be inherently stigmatizing. Other findings, like those in *G.D.W.*, are, of course, at the other end of the spectrum and will certainly have a stigmatizing effect. In *G.D.W.*, the court expressed no hesitation in concluding that "the social stigma that [the] father suffers as a result of the judicial finding that he sexually abused his daughter is significant." 353 Or at 32. The range of findings that a juvenile court can make, however, gives us pause. Mother has not provided us with

settled social science demonstrating—and we are unwilling to conclude based on our own knowledge and experience—that juvenile court jurisdictional judgments are so inherently stigmatizing that they justify our adoption of a categorical rule permitting their appeal in all but extraordinary circumstances.

That does not mean, however, that we adopt the contrary categorical rule that a juvenile court's termination of wardship renders an appeal moot in all but extraordinary circumstances. The Court of Appeals has said that "a juvenile court's termination of jurisdiction and wardship ordinarily renders the parent's appeal of the underlying jurisdictional judgment moot." *Dept. of Human Services v. B.A.*, 263 Or App 675, 678, 330 P3d 47 (2014). That statement may or may not be a correct factual statement, but we do not understand it to indicate that the Court of Appeals has adopted a presumption of mootness or imposed a burden on a parent to prove extraordinary circumstances. To the contrary, the party moving for dismissal has the burden to establish that a case is moot. *See Brumnett*, 315 Or at 407 (noting that moving party had met its burden to prove that case was moot). That includes establishing that the decision being challenged on appeal will have no further practical effect on the rights of the parties.

To meet that burden, the department need not imagine all potential collateral consequences that could result and prove their nonexistence. Rather, when the department takes the position that termination of a wardship renders an appeal moot and demonstrates that the child is no longer subject to departmental control, the appellant parent must identify any continuing practical effects or collateral consequences that, in the parent's view, render the appeal justiciable. The department then must meet its burden of persuasion. It must demonstrate that the effects or consequences that the parent identifies are either legally insufficient or factually incorrect. It will be up to the appellate court to determine the existence and significance of those effects or consequences and to decide, as a prudential matter, whether an appeal is moot. *See Couey v. Atkins*, 357 Or 460, 355 P3d 866 (2015) (explaining prudential basis for dismissal of most cases). An appeal is not moot unless the party moving for

dismissal persuades the appellate court that the dismissal is warranted.

Thus, in *G.D.W.*, the father argued that his appeal was not moot and raised the potential for continuing practical effects and collateral consequences. 353 Or at 32. The department did not persuade us that those effects and consequences were factually incorrect or legally insufficient, and we concluded that the father's appeal was not moot. *Id.* We take the same approach here.

Mother contends that the juvenile court's adjudication that she abused and neglected her child with special needs will have the following practical effects or collateral consequences: (1) it will disadvantage her in any future departmental child abuse and neglect proceedings and in any custody proceedings against the child's father; (2) it limits her options for employment or volunteer work requiring a background check; and (3) it stigmatizes her with her child's service providers. The department responds that the consequences on which mother relies are speculative and that mother therefore has failed to establish collateral consequences that render her appeal justiciable.

As we have explained, the burden of persuasion does not lie with mother. She has done what is necessary by identifying the collateral consequences that she believes she will face. The burden is on the department to persuade us that those consequences are factually incorrect or legally insufficient. For the reasons that follow, we conclude that the department has met that burden here.

The first consequence that mother raises is the one that we find most concerning. It seems to us that the three findings that the juvenile court made about mother could affect the department's evaluation of her conduct in the future. The court found that (1) mother presented a threat to her child's safety because she "is aware that her domestic partner has a conviction for a sex offense, has threatened to kill her and her child, has engaged in a pattern of violent, threatening and mentally unstable behavior that presents a threat to [the] child's safety because the mother continues to allow him in the home and around the child"; (2) the "child is in need of therapeutic treatment that the mother

has failed to provide"; and (3) mother "failed to provide for the educational needs of the child." In a future investigation of similar conduct, it is possible that the department will consult its records and those of the juvenile court. In that instance, the department may be aware of those findings and could be more inclined to assert jurisdiction because of them. However, unlike the findings of sexual abuse made in *G.D.W.*, the findings that the court made in this case do not affect the standard that the department must apply in evaluating mother's conduct or the assistance the department must provide. And, we are persuaded that, if the department considers allegations concerning mother in the future, the existence of the findings and judgment will not be significantly disadvantageous. In consulting its records and the juvenile court records in the future, the department would consider not only the finding that, at one point in time, mother had neglected some of her parental duties, but also the finding that her child is "extremely attached" to her. The department would be apprised that, when offered assistance, mother quickly took advantage of and benefitted from the developmental disability services that were provided. It also would know that the juvenile court had terminated the child's wardship before its planned review date and dismissed the case based on a finding that the department had no continuing safety concerns. The challenges that mother faces in raising a child with the special needs that her child has are enormous, and the departmental and juvenile court records demonstrate mother's sincere commitment to do everything that she can for him. We are persuaded that the jurisdictional judgment will not have a significant practical effect on her rights.

We also are persuaded that there is little likelihood that the jurisdictional judgment will affect mother's right to sole custody in the future. We do not, however, base our decision solely on the fact that father has not yet filed for custody. In *G.D.W.*, the father was found to have sexually abused his daughter, and he in fact lost custody of his children. 353 Or at 30-31. However, that factual finding was not necessary to the court's holding. *Id.* at 32. The court said that, if the findings and judgments were to be vacated, the "father's ability to reopen the custody and parenting time judgment might

be positively affected." *Id.* In this case, mother also might be in a better position to resist a motion by father if the jurisdictional judgment were reversed. However, the record does not establish that father has any interest in challenging mother's sole custody or that it would give him any basis to do so. The record establishes that mother always has been the child's primary parent, that he is "extremely attached" to her, and that, even when the court had concerns about the child, it placed him with her and not his father. The court terminated the wardship because it did not have continuing safety concerns and found mother to be a "fit" parent. Those facts mitigate the effect that the jurisdictional judgment could have in any future domestic relations proceeding between the parents.

Mother also is concerned about legal limitations on her options for employment or volunteer work and notes that various laws or regulations may require a background "abuse" check, should mother apply for positions in the future. However, in our view, it is unlikely that the juvenile court's findings and judgment would disqualify mother from positions for which she might apply. Again, our reasoning is not based on the fact that mother has yet to be turned down for such a position; a party need not demonstrate that a collateral consequence already has occurred to maintain an appeal.  Rather, our reasoning is based on our reading of the law and the limits that it imposes. If the law clearly limited mother's options for paid or volunteer work, we would be persuaded of the judgment's continuing practical effects. But we do not interpret the law to which mother points as establishing such clear limits.

Finally, we consider the social stigma that mother experiences. Mother relies on the stigma "that goes along with being involved with DHS." However, the only stigma that is relevant to the question of mootness is the stigma that accompanies entry of the jurisdictional judgment and that could be affected by its reversal. The child was not removed from mother's care, and mother does not claim that those in her immediate family or those who work with her child know of, necessarily will know of, or have discredited her as a result of the jurisdictional judgment. Instead, she says that she is constantly concerned with what others will

think if they should find out about the founded allegations. We appreciate mother's understandable worry, but the law provides her with some protection against disclosure. Given the concerns that mother has identified, the department has met its burden to persuade us that, in this case, the jurisdictional judgment will not have practical effects on mother's rights.

The decision of the Court of Appeals is affirmed.