GARRETT, J.
*1177 *607 This juvenile dependency case arose out of the death of a three-month-old girl, C, who died of undetermined causes while sleeping with father. After evidence surfaced that father had likely caused nonaccidental injuries to C before her death, the juvenile court assumed jurisdiction over C's surviving twin brother, M. The court found that father had posed a risk of physical harm to the twins and that mother knew or should have known about that risk and had failed to protect the twins from father. The court determined that there was a nonspeculative risk of physical harm to M under mother's care.
Mother appeals, arguing that the evidence in the record does not support the juvenile court's finding that mother "knew or should have known" about the risks that father posed to the twins. Mother also argues that the evidence in the record is not legally sufficient to permit the ultimate determination of a risk of harm to M. The Department of Human Services (DHS) argues that the appeal is moot but that, if it is not moot, the juvenile court's judgment should be affirmed. We conclude that the case is not moot, and affirm.
The following facts were presented at trial and are mostly undisputed. Mother and father married in 2015. Early in their relationship, father told mother that he had been investigated by DHS for the suspected abuse of an infant in 2007. Mother understood that father had possibly been ordered to engage in some services with DHS, including a psychological evaluation, but that father's engagement with DHS was terminated because his paternity over the infant was disestablished. Mother also knew that, in 2010, father was convicted of assault for physically attacking another man.
On June 24, 2017, mother gave birth to twins: a girl, C, and a boy, M. A nurse, Hoertkorn, occasionally helped parents care for the children. In the early morning of September 21, 2017, when the twins were about three months old, C died while sleeping with father.
An autopsy revealed a bruise under C's left eye, another bruise on her left arm, and four "healing rib *608 fractures." Medical personnel were unable to determine the precise cause of C's death. Doctor St. Germain observed the autopsy and concluded that the bruises and rib fractures did not cause C's death; she also concluded that C's injuries existed before her death and were caused by a level of force that was inconsistent with them being accidental. When told about the injuries, father denied knowledge of the broken ribs and bruise on C's arm but speculated that the rib injuries might have happened accidentally in his care. As for the bruise under C's eye, father suggested that it happened while he was holding her, when her head bobbed forward and hit father's collarbone. St. Germain did not believe father's explanation and suspected that father had inflicted C's injuries intentionally.
Detective Vreim spoke to mother a couple of days after C's death. At that time, mother did not know about the injuries to C's arm and ribs. Mother said that she was aware of the bruise on C's face and that she believed father's explanation for it. Mother also said that she was holding "some resentment and anger toward[s]" father and "wished that she could blame him," but that she "knew" that "he didn't do anything." She reported that, more than once, she observed father saying "mean" things to the twins when they were crying that she believed showed impatience, like "quit being dramatic," "what's your fucking problem," and "shut the fuck up!" However, mother remarked that, if father had *1178 done anything to the twins intentionally or accidentally, she would have seen it. When Vreim told mother about C's broken ribs, mother said that she could not think of a reason why that would happen. She also said that she "couldn't be sure that [father] didn't injure [C]," that she had a "nervous feeling about" father, and that "something felt wrong."
Authorities alerted DHS to the situation. A DHS caseworker, Layton, contacted parents and discussed a safety plan for M. The plan required M and the parents to live with family friends whom DHS had approved as "safety service providers,"[1] and who had to provide "sight-and-sound"
*609 supervision for all of parents' contact with M. Mother and father followed the safety plan. For a short while after C's death, mother, father, and M lived together at the safety providers' home. In late September or early October, father moved out and left M in mother's care.
As time passed, mother's feelings about father wavered. In late September or early October, mother told Layton that she intended to divorce father because she "couldn't emotionally support him any more." However, when mother spoke with Layton again in early October, she said that she "was unsure if they were going to separate or if they were just going to take some time apart." Father's account from that period was consistent with mother's statements: On or about October 1, father told Layton that he and mother "were still together" but that he was uncertain if that would last.
In early November, mother told Chappell that she had again decided to file for divorce, but then, on or about November 17, mother told Chappell that she "wasn't sure" about whether to do so. Several weeks later, mother reported to Chappell that she had "the paperwork" for divorce and intended to file it. However, she did not do so until January 17, 2018, the day before the jurisdictional trial. In the stipulated divorce decree entered on that date, mother was awarded sole legal custody of M, and father was allowed supervised parenting time at mother's discretion.
At trial, Layton and Chappell testified on behalf of DHS about two primary concerns regarding mother's ability to care for M. First, DHS was concerned about mother's ability to "recognize people being harmful to her child, whether verbally or physically," as evidenced by her failure to notice father's inflicting C's injuries or otherwise respond to father's concerning behaviors around the twins. Second, DHS was concerned that, although mother was capable of meeting M's basic needs, mother's vacillating intentions regarding father, as well as her failure to "recognize or act upon how [father] treated" C and M, created the possibility that mother "would either return into a relationship with [father], or allow other unsafe people around" M. Layton and Chappell also testified that DHS's 2007 investigation *610 of father was triggered because father was suspected of inflicting bruises on the chest of an infant. As a result, DHS had ordered father to participate in a psychological evaluation, anger management counseling, parenting classes, and alcohol and drug treatment, however father did not complete those programs because paternity over the infant was later disestablished.
Meanwhile, mother testified that she no longer blamed father for C's death and that she "knew" that "he would never hurt our children intentionally." Mother explained that she had known about at least some of the circumstances surrounding father's 2007 investigation by DHS but that the incident gave her no concerns about father's ability to parent. Mother also testified that she thought that father's 2010 assault conviction "has to do with anger." When twice asked whether she thought father "had a role" in C's injuries to the arm and ribs, mother first answered "no" and later answered "I don't know." Mother had no explanation for how those injuries occurred. She also said about father, "He is a good father and he deserves to be in his son's life. * * * I just need to know that he can handle the frustration when it gets bad. That's all."
*1179 On the topic of parents' relationship, mother testified that she "still loved" father but that she was "conflicted" about him. When asked about whether she would reconcile with father, she said that that was "not part of the plan."
At the conclusion of the evidence, the juvenile court made the following findings:
"[T]he evidence allows me to infer that the father likely did cause [C's] injuries; and that the mother failed to act protectively in light of her knowledge of the risks he posed at the time.
"Given that the mother has new information now about the injuries, in addition to what she knew before * * * it is more disturbing now that there is-at least over the course of time, been a reluctance on her part to take steps necessary to separate, of her own volition, from [father and] to keep the child away from [father].
"The issue isn't-and I want to clarify-the issue isn't whether they're married or divorced. * * * [T]he paperwork *611 itself regarding the divorce is * * * not consistent with the parties' conduct leading up to [trial].
"But the * * * continued choice to * * * have this continued contact with [father] calls into question why it is that the two join together, apparently on the advice of a lawyer who represents them in this case, in the Juvenile Court case, calls into question what their intent really is.
"It's not fair to anybody to argue that divorce is what was * * * required. Actually, the State of Oregon policy is that we should encourage families to stay intact. But when we're balancing the rights of children to be safe with the rights of people to * * * remain married, if they choose to remain married, the Court has to look at the conduct, not so much the paperwork. And * * * I do find that the last-minute attempt with the divorce paperwork actually supports the notion that it was sort of a last-ditch effort to prove, by paperwork, that which is not evident by conduct."
The court concluded:
"Given the history of abuse, given the * * * postmortem findings of abuse, given the mother's current awareness of abuse, and her own decision to * * * choose to find a way to continue the relationship with the father, despite the paperwork to the contrary, supports the notion that there is a nonspeculative risk of harm to the surviving twin in this case."
On January 30, 2018, the court entered a judgment assuming jurisdiction over M. The judgment included findings that the state had proved that "[t]he child's infant twin sibling died while in the mother's care and was discovered after death to have suffered substantial, unexplained injuries that occurred while living with the mother," as well as that "mother failed to act protectively when she knew or should have known that her child was at risk of harm from the child's father." Mother appeals, challenging the court's findings and ultimate determination that a risk of harm to M existed under mother's care.
On July 11, 2018, while mother's appeal was pending, the juvenile court held a review hearing during which DHS asserted that mother had alleviated its concerns and that there was no longer a risk of harm to M under mother's care. On July 19, the juvenile court entered a judgment that *612 dismissed jurisdiction without making any findings of fact. In light of that dismissal, DHS argues that mother's appeal is moot and must be dismissed. DHS alternatively argues that, if the case is not moot, the juvenile court's jurisdictional judgment should be affirmed on the merits.
We address the mootness issue first. The Supreme Court recently clarified the legal framework for determining whether a jurisdictional judgment is moot after wardship is terminated. In Dept. of Human Services v. A. B. , 362 Or. 412, 426, 412 P.3d 1169 (2018), the court explained that the party moving for dismissal-here, DHS-has the burden of showing that "the decision being challenged on appeal will have no further practical effect on the rights of the parties." To meet its burden, DHS "need not imagine all potential collateral consequences that could result and prove their non-existence"; rather, the nonmoving party must "identify any continuing practical effects or collateral *1180 consequences that, in the parent's view, render the appeal justiciable." Id. DHS must then demonstrate that those effects or consequences are either legally insufficient or factually incorrect. Id. The appeal is not moot unless DHS persuades the reviewing court that dismissal is warranted. Id. at 426-27, 412 P.3d 1169.
Here, mother contends that the findings in the jurisdictional judgment will disadvantage her in any future child welfare investigations and proceedings because the findings "leave[ ] the juvenile court [and DHS] with the impression that jurisdiction would again be warranted should similar circumstances arise in the future." Mother also argues that the social stigma flowing from the jurisdictional judgment constitutes a practical adverse effect.
The first consequence that mother identifies is a valid concern. See id. at 427, 412 P.3d 1169 (finding "most concerning" mother's assertion that an unreversed jurisdictional judgment "will disadvantage her in any future departmental child abuse and neglect proceedings"). DHS argues that that consequence is insufficient to prevent the case from being moot because, regardless of whether the jurisdictional judgment is upheld or reversed on appeal, DHS will always have knowledge of its own previous decision to investigate and initiate proceedings against mother. DHS also argues *613 that the existence of the jurisdictional judgment will not significantly disadvantage mother because DHS will also know that mother later alleviated DHS's concerns, which led to termination of the wardship.
DHS's arguments are unconvincing. It is one thing that DHS initiated proceedings-it is another that DHS prevailed in court. That success may increase the likelihood that DHS will initiate proceedings again in the future. Such a prospect was expressly identified in A. B. as a factor counseling against a determination of mootness, and we fail to see a difference here. Cf. id. at 427-28, 412 P.3d 1169 (jurisdictional judgment "could affect the department's evaluation of [the mother's] conduct in the future" because the department "could be more inclined to assert jurisdiction because of" the findings).
Mother's concern about social stigma also weighs against dismissing the case. We look again to A. B. , where the Supreme Court addressed the social stigma that can be associated with such judgments and held that whether such stigma is sufficient to prevent a case from being moot must be addressed on a case-by-case basis. Id. at 423-26, 412 P.3d 1169. The court then concluded that the judgment in A. B. was not sufficiently stigmatizing because the judgment was confidential and contained relatively benign findings-effectively, that mother had merely "neglected some of her parental duties." Id. at 428-30, 412 P.3d 1169.
Mother argues that the judgment in this case includes findings far more stigmatizing than those at issue in A. B. We agree. The findings here go beyond a general "neglect of parental duties" and plainly permit the inference that mother could have prevented her child's death and failed to do so. It is true, as DHS points out, that jurisdictional judgments are confidential-a factor that generally reduces any associated stigma. See id. at 425, 412 P.3d 1169 (confidentiality of jurisdictional judgments "provides parents with some protection against social stigma"); Dept. of Human Services v. S. M. S. , 281 Or. App. 720, 723-24, 383 P.3d 991 (2016) (due to confidentiality of DHS and juvenile court records, parent can be stigmatized by jurisdictional judgment "only to the extent that the juvenile court's findings become known *614 to other people"). However, the record in this case reflects that mother's approved safety-service providers as well as M's nurse, Hoertkorn, were present for the jurisdictional trial and are likely to be aware of the nature of the court's findings. We agree with mother that the continued existence of the jurisdictional judgment could affect the relationships between mother and those key people in M's life.
For the foregoing reasons, we conclude that mother's appeal is not moot. We therefore proceed to the merits.
As noted, mother advances two challenges *1181 to the jurisdictional judgment.[2] First, mother argues that the record does not support the juvenile court's factual finding that mother "knew or should have known" that father presented a risk of physical abuse to the twins before C's death. Second, mother argues that the evidence was legally insufficient to support the juvenile court's determination that a nonspeculative risk to M existed under mother's care at the time of trial. Mother does not challenge the finding that father "likely did cause" nonaccidental injuries to C, nor does she dispute that father presented a current risk of physical abuse to M. See State ex rel. Juv. Dept. v. T. S. , 214 Or. App. 184, 195, 164 P.3d 308, rev. den. , 343 Or. 363, 169 P.3d 1268 (2007) (reviewing past cases and concluding that they establish "the general principle that it is easy to infer the likelihood of harm to a child by past physical * * * abuse of other children in the home").
On review of a jurisdictional judgment, we:
"(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with *615 that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."
Dept. of Human Services v. N. P. , 257 Or. App. 633, 639-40, 307 P.3d 444 (2013). We have described that standard as "analogous to the deferential review of other factually predicated determinations that are, ultimately, circumscribed by limits of 'matter of law' sufficiency, for example, denials of motions for directed verdict or motions for judgment of acquittal." Id. at 639, 307 P.3d 444. We thus "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." Id. at 639-40, 307 P.3d 444 (noting that the standard "does not allow us to substitute our assessment of the persuasiveness of the evidence for the juvenile court's, nor does it allow us to revisit the juvenile court's resolution of factual disputes or its choice among reasonable inferences").
Jurisdiction is appropriate where a child's "condition or circumstances are such as to endanger the welfare of" the child. ORS 419B.100(1)(c). A child's welfare is "endangered" under the statute if conditions and circumstances "give rise to a current threat of serious loss or injury to the child." Dept. of Human Services v. G. J. R. , 254 Or. App. 436, 443, 295 P.3d 672 (2013). The "key inquiry in determining whether condition[s] or circumstances warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." Dept. of Human Services v. C. Z. , 236 Or. App. 436, 440, 236 P.3d 791 (2010) (internal quotation marks omitted; brackets in original). DHS bears the burden of showing that a nexus exists between the parent's conduct or condition and a threat of harm to the child that exists at the time of the jurisdictional trial. Dept. of Human Services v. A. W. , 276 Or. App. 276, 279, 367 P.3d 556 (2016) ; Dept. of Human Services v. D. M. H. , 272 Or. App. 327, 329, 355 P.3d 206 (2015).
For the reasons explained below, we reject mother's challenges.
*616 First, DHS presented evidence that mother knew that DHS had investigated father in 2007 for the abuse of another infant, and that, as far as mother was aware, the only reason why father's engagement with *1182 DHS was terminated was that his paternity over the infant was disestablished. Mother testified that she also knew that father had been convicted of assault in 2010 for physically attacking another man-an incident which mother recognized "has to do with anger."[3] Moreover, mother herself testified to having subjective concern about father's tendencies toward anger around the twins, based on his inappropriate comments toward them. In addition, DHS presented evidence that mother had been aware of the bruise on C's face-a bruise that, according to St. Germain, developed before the child's death and was not accidental. That evidence logically supports an inference that mother was aware before C died that father posed at least a risk of physical abuse. Cf. Dept. of Human Services v. K. V. , 276 Or. App. 782, 791-92, 369 P.3d 1231, rev. den. , 359 Or. 667, 379 P.3d 523 (2016) (juvenile court could infer that the father would have seen the same bruises on the child's face and body that were observed by medical personnel).
In short, the record contains evidence to support the juvenile court's finding that mother "knew or should have known" that father posed a risk of physical danger to the twins and that mother failed to protect them from that risk. See N. P. , 257 Or. App. at 639, 307 P.3d 444 (reviewing the juvenile court's findings of historical fact for whether they are supported by "any evidence" in the record). Cf. K. V. , 276 Or. App. at 791-92, 369 P.3d 1231 (evidence supported finding that the father failed to protect the child from the mother where the juvenile court could infer that the father would have seen bruises on the child, where a doctor testified that the mother's explanation for the bruising did not explain the bruises and that the bruises were probably caused by abuse, and where the father "took no action to protect [the child] from [the] mother after seeing the bruises");
*617 State ex rel. SOSCF v. Imus , 179 Or. App. 33, 44, 39 P.3d 213 (2002) (jurisdiction upheld where the mother caused bruising to a child through abuse, and where, "whether through lack of awareness of the abuse or its causes, lack of effective prevention of the abuse, or for some other reason, [the] father had failed to protect the younger child from physical abuse").
Second, we conclude that the evidence presented at trial was legally sufficient to permit the juvenile court to determine that a nonspeculative risk of harm to M existed under mother's care. DHS presented evidence that mother was, at the very least, reluctant to acknowledge that father posed a risk of abuse to children. Mother testified that she always knew about father's 2007 DHS investigation and his 2010 assault conviction and she had observed his verbal expressions of anger toward the infant twins, and yet she had no concerns about father's ability to parent. Mother had told Vreim in the days immediately following C's death that she "couldn't be sure that [father] didn't injure" C, that she had a "nervous feeling about" father, and that "something felt wrong." At trial, although mother had apparently decided to separate from father, she also testified that father would "never" abuse M-even though there was, at that point, more evidence that father had abused C. That evidence included (1) St. Germain's discovery of a second bruise on C's arm as well as four broken ribs, which St. Germain opined were inflicted by father; and (2) additional details about the 2007 DHS investigation-namely, that it was opened because of injuries similar to C's on another infant's chest. Despite that evidence, mother testified that she did not think that father had played a role in C's additional injuries. Mother later added that she "know[s]" that father "would never hurt our children intentionally" and that father "is a good father and he deserves to be in his son's life." Even that statement of confidence, however, was qualified by mother's statement that "I just need to know that he can handle the frustration when it gets bad." From this evidence, the juvenile court reasonably could have determined that mother had enough information to form subjective concerns about father but was unable *1183 or unwilling to comprehend the likelihood that father caused injury to C and the risks that he therefore posed to M. *618 There was also ample evidence that mother continued to have contact with father and lacked a clear intention to separate from him. DHS caseworkers testified that mother had changed her mind repeatedly about whether or not to divorce father, and, when she ultimately decided to divorce him, she did not do so until the day before trial several weeks later. That evidence supported the juvenile court's findings that the divorce decree was not credible evidence of mother's intent and that there was a "question" about what mother's "intent really is" notwithstanding her assertion that reconciling with father was "not part of the plan."
The foregoing evidence supports the implicit finding by the juvenile court that mother would likely fail to protect M from father in the future. See K. V. , 276 Or. App. at 792, 369 P.3d 1231 (evidence that the father did not appreciate risks that the mother posed to the child supported the juvenile court's implicit finding that the father would likely fail to protect the child from the mother, where the evidence included the father's beliefs that there were no "issues" with the mother's parenting and that the mother had not abused another child). Accordingly, we conclude that the evidence in this record was legally sufficient to permit the court to determine that a nonspeculative risk of harm to M existed under mother's care.
Mother contends that the above evidence is insufficient to establish a nonspeculative risk of harm because DHS's evidence, at bottom, merely reflects mother's "feelings and beliefs," which do not permit an inference that she will take any specific action that will put M in a situation in which he could be harmed by father. Mother relies on Dept. of Human Services v. J. M. , 260 Or. App. 261, 317 P.3d 402 (2013), in which we reasoned that a father's personal belief that Christian scriptures allowed corporal punishment did not permit an inference that he would likely use corporal punishment against his children in the future, given that the father had credibly asserted that he would not do so and that he had completed a parenting education class with outstanding marks. Id. at 268-69, 317 P.3d 402 (rejecting the "implication" that a parent's "failure to internalize the social norms * * *
*619 implies that he is unlikely to conform to those norms"). Mother thus argues that the evidence of her mere "feelings and beliefs" in this case is legally insufficient to support the inference that she is "likely to abandon her safety plan or reunite with father and allow him unfettered access" to M.
We are not persuaded by the analogy. J. M. stands for the proposition that it cannot be inferred that a parent will fail to comply with a directive simply because the parent may disagree with it. In J. M. , although the father held personal opinions regarding the propriety of corporal punishment, there was no evidence that he was unable or unwilling to comply with the directive that he not engage in that conduct. Id. at 269, 317 P.3d 402. In this case, we understand the juvenile court to have determined that mother is unable or unwilling to fully appreciate the risks posed by father, and that, as a result, mother will not recognize or respond appropriately to situations in which M is endangered. See Dept. of Human Services v. A. B. , 264 Or. App. 410, 418-19, 333 P.3d 335 (2014) (distinguishing J. M. where DHS linked the risk of harm to the child to the "mother's lack of insight" and continued minimization of "the severity of the circumstances that led to DHS's involvement"); see also K. V. , 276 Or. App. at 793-94, 369 P.3d 1231 (affirming juvenile court's determination that the father's failure to take protective action for his children and his denial that the mother posed risks of harm to the children created a reasonable likelihood of harm to his children, notwithstanding that the parents had been separated for seven months before the jurisdictional trial, and were in the process of divorcing); T. S. , 214 Or. App. at 196, 164 P.3d 308 (affirming juvenile court's determination that the mother's failure to take protective action for her children and her denial that the father posed risks of harm to the children created a reasonable likelihood of harm to her children, notwithstanding that the parents were separated, that mother had abided by DHS's safety plans, and that mother *1184 asserted that she would continue to follow the safety plan).
In short, we conclude that the juvenile court's factual findings were supported by evidence in the record and further that the evidence in the record was legally sufficient *620 to support the determination that placing M in mother's care would put M at risk of serious loss or injury. The juvenile court did not err in assuming jurisdiction over M.
Affirmed.

A "safety service provider" is a person who participates in a DHS-coordinated child welfare plan and "whose actions, assistance, or supervision help a family in managing safety." OAR 413-015-0115(55).

Mother also challenges the juvenile court's determination that "[t]he child's infant twin sibling died while in the mother's care and was discovered after death to have suffered substantial, unexplained injuries that occurred while living with the mother." However, mother fails to develop a specific argument as to why the evidence is insufficient to support that finding. Based on the facts discussed above, we conclude that there was sufficient evidence to support that finding, and we reject mother's challenge without further discussion.

Under other circumstances, a parent's conviction for assaulting another adult might have little relevance to the question of whether the parent poses a risk to a child. In this case, however, the juvenile court could reasonably have found that father has tendencies toward anger that manifest in violent acts directed at adults and children.