Argued and submitted December 17, 2015, reversed March 23, 2016

In the Matter of B. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. M.
and R. M.,
*Appellants.*

Douglas County Circuit Court
1400192;
Petition Number 14JU215;
A159382

370 P3d 878

Megan L. Jacquot argued the cause and filed the brief for appellant M. M.

Caitlin Mitchell argued the cause and filed the brief for appellant R. M.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.*

TOOKEY, J.

---

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

## TOOKEY, J.

In this juvenile dependency case, both parents appeal from a judgment of the juvenile court that took jurisdiction over their infant son, B, on the grounds that mother has a substance abuse problem that impairs her ability to safely parent the child and father has a substance abuse problem and mental health issues that impair his ability to safely parent the child. Mother also challenges the dispositional judgment in the case. We reject without discussion mother's first two assignments of error, which relate to the jurisdictional judgment. Father contends that the evidence in the record was insufficient to allow the juvenile court to determine that his substance abuse and mental health issues existed and posed a present risk of serious loss or injury to B that was likely to be realized if B were placed in father's care. For the reasons that follow, we agree and, accordingly, reverse the jurisdictional judgment. That reversal also requires reversal of the dispositional judgment.

On review of a jurisdictional determination, where, as here, we do not review *de novo*, we "(1) assume the correctness of the juvenile court's explicit findings of historical fact if those findings are supported by any evidence in the record" and "(2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013). Ultimately, we "assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine" that the standard for jurisdiction was satisfied. *Id.* at 640.

A juvenile court has jurisdiction over a child under ORS 419B.100(1)(c), when the child's "condition or circumstances are such as to endanger the welfare of the [child]." That requires that the child's condition and circumstances "'give rise to a current threat of serious loss or injury to the child,'" *Dept. of Human Services v. D. H.*, 269 Or App 863, 866, 346 P3d 527 (2015) (quoting *Dept. of Human Services*

*v. G. J. R.*, 254 Or App 436, 443, 295 P3d 672 (2013)), that is reasonably likely to be realized, *Dept. of Human Services v. D. M.*, 248 Or App 683, 686, 275 P3d 971 (2012). The Department of Human Services (DHS) must prove "that there is a *current* risk of harm and not simply that the child's welfare was endangered at some point in the past." *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (emphasis in original).

The evidence in the record was presented by DHS, mother, and father during a 10-day jurisdictional trial that took place over the course of five months, between December 2014 and April 2015. The main issue at trial was an allegation in the petition that father presented a risk to B because he had sexually abused one of his stepdaughters (one of mother's daughters) during the year before B's birth. The juvenile court ultimately found that DHS had not proved that sexual abuse had taken place; accordingly, it did not take jurisdiction on that ground. However, as noted, the court found that DHS had proved that father's parenting posed the requisite risk to B based on the substance abuse and mental health grounds alleged in the petition.

A detailed discussion of the voluminous evidence presented—which pertained mostly to the alleged sexual abuse—would not benefit the bench, the bar, or the public. Accordingly, we confine our discussion of the facts and the juvenile court's findings to those necessary to explain our conclusion that the evidence on which the juvenile court relied in taking jurisdiction over B was deficient for two reasons: First, it was out of date—it concerned circumstances that existed approximately a year before the trial and entry of judgment, and those circumstances had changed substantially in the intervening time—and second, the undisputed fact that father had post-traumatic stress disorder (PTSD) was not tied to any risk of harm to B.

Father's substance abuse problem presents unusual facts. It was undisputed at trial that father is opposed to drug and alcohol use and does not use substances other than pain medication that is prescribed to him for pain that he suffers from injuries he sustained during military service. Mother, on the other hand, has a longstanding substance abuse

problem. During parents' relationship, mother used a wide variety of drugs and obtained them, as she described it, "all over the place." Father knew of some of mother's drug use, but he did not know that she used methamphetamine. The juvenile court found that father "was willing to give [mother] his prescription drugs as a way to deal with [mother's] illicit drug use." However, the court also found that father never actually "gave [mother] his prescription drugs to use." DHS argued, and the juvenile court agreed, that father's willingness to share drugs with mother was drug abuse and that it presented a risk to B because mother's drug use made mother unavailable to parent.

The court also found that father abused drugs by misusing his prescribed pain medication in an attempt to commit suicide in February 2014, shortly after his stepdaughter alleged that he had sexually abused her. (We discuss the suicide attempt in more detail below.) That presented a risk to B, the court found, because, if father were to attempt suicide again, he would be unavailable to care for B.

The parties argued, and the juvenile court found, that those substance abuse grounds for jurisdiction were intertwined with the mental health grounds, which, as discussed below, included father's codependent relationship with mother (the cause of his willingness to share his prescriptions with her) and his suicide attempt (which encompassed his one-time misuse of his prescription drugs). Under these circumstances, we consider all of the allegations together to decide whether DHS proved that father's problems, whether characterized as mental health or substance abuse problems, posed a current risk of serious loss or injury to B likely to be realized if B were in father's care.

A significant part of the evidence relating to father's problems concerned father's relationship with mother. Specifically, the juvenile court found that father's codependency contributed to his risk of suicide—around the time of his suicide attempt in February 2014, father stated that he could not live without mother, and he again threatened suicide when she ended their relationship in May 2014—and, as noted above, the court also found that his willingness

to share his prescriptions with mother posed a risk to B by making mother unavailable to parent. However, it was undisputed that, by the time the jurisdictional judgment was entered, parents had been separated for almost a year and mother was in a relationship with, and living with, someone else. Thus, risks arising from parents' codependent relationship were no longer current by the time of trial or the jurisdictional judgment. Parents' past codependent relationship, if it were paired with evidence of father's involvement in other codependent relationships, might contribute to a determination that father had a pattern of engaging in those types of relationships or threatening or attempting suicide because of those relationships. However, without more recent evidence of those types of relationships or other circumstances, the evidence of problems in parents' relationship does not show continuing problems that pose a risk to B because father's relationship with mother has long been over.

Similarly, the vast majority of the evidence regarding father's mental health comes from February 2014, when he attempted suicide shortly after his stepdaughter alleged that he had sexually abused her and she and her two sisters were taken from the family home by DHS, and mother informed him that she would be ending their relationship. Around that time, father's speech seemed incoherent and garbled and he was verbally aggressive while he was discussing the sexual abuse allegations with a DHS caseworker over the telephone. In a police interview a few days later, in the course of expressing his willingness to take a polygraph regarding the sexual abuse allegations, father noted that methadone, one of his prescribed drugs, "really messes [him] up."[1] He also said that, as a result of his military experience, he "always ha[d] a plan" to commit suicide. The juvenile court relied on those circumstances to determine that at the end of the evidentiary portion of the trial in February 2015, and when the judgment was entered in April 2015, father's mental health posed a risk to B. The record does not reveal any information about father's mental health in the

---

[1] The juvenile court did not determine that father's normal use of his prescribed medications posed a risk to B, nor would the record have supported that determination.

time—nine months—between B's birth in June 2014 and February 2015.[2]

We agree with DHS and the juvenile court that, in February 2014, father was suffering from problems that would then have posed a risk to B if he were in father's care. (We note, however, that B was not born until June 2014.) However, as noted above, by April 2015, father and mother had been separated for nearly a year and the juvenile court had found that the alleged sexual abuse had not occurred.[3] In the absence of evidence of father's mental health in his new, substantially different circumstances, the evidence of father's problems in February 2014 and attendant suicide attempt does not allow an inference that father's mental health presented a *current* threat of serious loss or injury to B. *See D. H.*, 269 Or App at 868 (the mother's suicide attempt, which was "a singular act in response to the traumatic event of having [the child] removed from her care," did not "permit the inference that the unstable mental condition that led mother to [attempt suicide] persisted at the time of the jurisdictional hearing, several months" later).

The remainder of the evidence of father's problems rests on the undisputed fact that father has PTSD as a result of his military service. Based on that undisputed fact and the juvenile court's view that there was no evidence that father's PTSD had been treated, the court found that father's PTSD was untreated. Because the court determined, as a matter of common sense, that PTSD is a serious illness, it concluded that father's PTSD would pose a risk to B if he were in father's care. Father points out, however, that not only was there no evidence that father's PTSD was untreated, but there is affirmative evidence in the record— testimony of a DHS caseworker—that, around the time of B's birth in June 2014, three months after father's suicide attempt, father's PTSD was being treated through the

---

[2] A DHS caseworker testified that, at the time of B's birth in June 2014, father was taking medication for depression and was being treated for PTSD through the United States Department of Veterans' Affairs. Other than that, the record is entirely devoid of information about father's mental health after February 2014.

[3] The record does not indicate that father was criminally charged with sexual abuse.

United States Department of Veterans' Affairs. There is also an absence of evidence of symptoms of PTSD displayed by father other than nightmares, thrashing in his sleep, and general verbal aggressiveness over the telephone with the DHS caseworker in February 2014.[4] Thus, apart from the suicide attempt, the circumstances of which, as discussed above, do not allow an inference that father's mental health posed a current risk of harm to B, the record does not reveal any significant symptoms—let alone any symptoms that might persist a year later and would not have been remediated by treatment—of father's PTSD that demonstrate a risk of serious loss or injury likely to be realized by B, if B were in father's care.

Because the record is not sufficient to support the juvenile court's determination that father had mental health and substance abuse problems that presented a current risk of serious loss or injury to B likely to be realized if B were in father's care, we reverse the jurisdictional judgment. That reversal also requires reversal of the dispositional judgment. ORS 419A.205(4)(a) ("When an appeal is taken from a judgment finding a child or youth to be within the jurisdiction of the court, if the appellate court * * * [r]everses the judgment, the judgment disposing of the matter is reversed[.]"); *Dept. of Human Services v. N. L.*, 243 Or App 596, 602, 260 P3d 537 (2011) (under ORS 419A.205(4)(a), previous reversal of jurisdictional judgment "had the effect of reversing the juvenile court's [dispositional judgment], which was pending on appeal at the time of our decision").

Reversed.

_____

[4] A DHS caseworker also testified that, during her telephone conversation with father, he tried to "use power and control" over her and that that could be a symptom of PTSD. However, the court's findings in other respects, particularly its findings regarding sexual abuse and that father did not give mother prescription drugs, suggest that the court rejected that testimony, which was intertwined with the contention that father used his prescription drugs as a means to exert control over mother during their relationship. Even if the court did not reject that testimony, father's use of "power and control" with the DHS caseworker over the telephone does not evidence a risk of harm to B.