Submitted March 12, reversed December 15, 2021

In the Matter of S. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

Z. M.,
*Appellant.*

Deschutes County Circuit Court
20JU00101; A174686 (Control)

In the Matter of A. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

Z. M.,
*Appellant.*

Deschutes County Circuit Court
20JU00099; A174687

504 P3d 1208

Father appeals juvenile court judgments taking jurisdiction over his two children based on findings that his sexual abuse of another child and criminal activities (related to that sexual abuse) interfered with his ability to safely parent his own children. The court also took jurisdiction based on mother's admission that she was unable to protect the children from father's conduct because she lacked a custody order. Father argues that the evidence was insufficient to support any of the bases for jurisdiction. *Held*: Department of Human Services failed to present sufficient evidence establishing a nexus between father's sexual abuse of another child and related criminal conduct and a risk that he would sexually abuse his own children, or that the purported risk was current and nonspeculative. Therefore, mother's inability to protect the children from father based on his conduct could not provide a basis for asserting jurisdiction over the children as to her. However, even if the Court of Appeals were to conclude otherwise, the record was insufficient to demonstrate that mother could not protect the children from father because she did not have custody.

Reversed.

Bethany P. Flint, Judge.

Kristen G. Williams filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Philip Thoennes, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

Reversed.

Powers, J., dissenting.

**ORTEGA, P. J.**

The juvenile court took jurisdiction over father's two daughters, A and S, based on allegations that he sexually abused another child and was involved in criminal activities (related to the sexual abuse) that interfered with his ability to safely parent his own children. The court also took jurisdiction based on mother's admission of her failure to protect the children from that conduct due to a lack of custody of the children. Father appeals, arguing that the evidence was insufficient to support any of the bases for jurisdiction. We agree and reverse.

Father does not request *de novo* review, and this is not a case justifying such review. *See* ORAP 5.40(8)(c) (only in "exceptional cases" will we exercise our discretion to try the cause anew). Accordingly, we review the trial court's rulings for legal error, viewing the evidence in the light most favorable to the juvenile court's determinations and assuming the correctness of that court's explicit and implicit factual findings if any evidence in the record supports them. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013); *see also Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013) ("We review findings of fact *** for any evidence, and conclusions of law *** for legal error."). We state the facts consistently with those standards.

Father has two children with mother—A (born in 2008) and S (born in 2009). Mother and father divorced in 2011, mother moved out of the home, and the children remained with father. Pursuant to a domestic relations judgment, mother is allowed parenting time. Father married stepmother in 2014, and they had a son, R, in 2018. Stepmother has a daughter, M, from a previous relationship. All of the children lived in the home with father and stepmother.[1]

In March 2019, the Redmond Police Department (Redmond PD) received information from Wisconsin law enforcement that father and stepmother had sexually abused a teenage girl, K.H., and an investigation was opened.

---

[1] This consolidated appeal involves only A and S.

Detective Hicks of the Redmond PD learned that father and stepmother met K. H. in July 2016 at church when she was 15 years old. K. H. eventually began to babysit for father's and stepmother's children and also cleaned houses with stepmother. K. H. spent a lot of time with father and stepmother and, in 2016, they began to sexually abuse her. The abuse included both oral and vaginal sexual contact and occurred approximately 30 times. Sometimes only stepmother engaged in sexual contact with K. H., but otherwise father and stepmother together abused K. H. Father and stepmother would supply K. H. with marijuana and alcohol during the abuse. Although A and S were home during some of the abuse, they never observed it and were not aware that it was occurring.

Father and stepmother told K. H. that they loved her and wanted to have children with her someday, and they bought her a ring and proposed a polygamous marriage. Father, stepmother, and K. H. would send nude photos to one another, and father and stepmother would send K. H. love notes. Father and stepmother gave K. H. three tattoos, including a heart tattoo that matched stepmother's tattoo.

In February 2017, K. H. and her family moved out of Oregon. She returned to Redmond for a month later that year and stayed with father and stepmother, and the sexual abuse resumed during that time. No sexual abuse occurred after K. H. again left Oregon in about July 2017, when she was 16 years old.

Redmond PD discovered a second victim, L. W., who met father and stepmother at church in 2015 when she was 14. They spent time with her over a period of eight months, and one night, when L. W. was spending the night at father's and stepmother's home, they provided her with alcohol, and they all got drunk. Stepmother kissed L. W., but then went to the bathroom to throw up. While stepmother was in the bathroom, father sexually penetrated L. W. They had no further sexual contact after that incident.

In October 2019, father and stepmother were indicted on various charges for conduct related to K. H., including third-degree sodomy, second-degree sexual abuse, third-degree rape, using a child in a display of sexually

explicit conduct, furnishing alcohol to a person under 21 years of age, and allowing consumption of marijuana by a minor. Following their arraignment and with the court's approval, the children remained in their custody.

Two months later, in December 2019, Department of Human Services (DHS) learned of the allegations and opened an investigation into whether there was a potential threat of harm to the children. It concluded that, because father and stepmother "were unable to speak about the extent and circumstances of the allegations based on their ongoing criminal involvement" and "based on the indictments alone," it was necessary to restrict the parents' contact with all four children for up to 10 days while the department investigated. At the time, A and S were in Medford with mother so, with DHS's approval, they remained with her until their scheduled return in January and then were placed with father's parents, where R and M were also placed. Father and stepmother were prohibited from having any contact with the children. Mother informed DHS that she was prepared to become the full-time custodian for A and S but, instead, DHS sought protective custody of all four children, who remained with father's parents.

About a month later, DHS arranged for A and S to participate in a behavioral health assessment. DHS informed the evaluator that the children did not know what was going on and that DHS had not found any evidence of "any type of abuse in the home." A was diagnosed with adjustment disorder with depressed mood because of the removal from father's care as a result of DHS involvement. S likewise was diagnosed with adjustment disorder with anxiety, also related to her removal from father's care.

DHS concluded that it was "unknown how or if [father's and stepmother's] actions would likely result in negative impacts to the children" but also determined that mother could safely parent A and S, so it filed for a change in placement to have A and S returned to mother's care. However, father and the children opposed placement with mother. The juvenile court ordered that, although mother was "safe and appropriate *** for immediate placement," the children should remain with grandparents so as to reduce

disruption to their lives and allow them to prepare for the new living arrangement should jurisdiction be established.

The dependency petitions alleged that "mother is unable to protect the child[ren] from the father's criminal activities" and that father "is involved in criminal activities that interfere with his ability to safely parent" A and S and that he "has sexually abused another child which interferes with his ability to safely parent" A and S. Mother admitted that she is unable to protect the children from father's activities due to "the lack of a domestic relations order," and a jurisdictional trial was held to address the allegations against father. For purposes of that trial and to protect his right against self-incrimination in the pending criminal case, father agreed that the court and the parties would "assume that it has been established that [he] engaged in criminal activities and sexual abuse of another child."

The following additional evidence was admitted. Officer Hicks explained that he did not immediately alert DHS after father and stepmother were indicted and arrested, because he had received no evidence or reports that they had abused their children or exposed them to any type of criminal activity. DHS caseworker Eicher testified that, although DHS's assessment concluded that the presence of negative impacts on A and S were unknown, DHS nonetheless had concerns "given the fact that [A] and [S] are not [stepmother's] children" and the criminal allegations involved sexual abuse of minors.

Dr. Heavilin, the medical director of an agency that investigates allegations of child abuse, testified for DHS about what risks might be posed by father's conduct. She is trained to identify risk factors for child abuse and neglect and explained that when a caregiver abuses substances such as alcohol and marijuana, there is "an increased risk of the child experiencing all forms of abuse and neglect." When asked if "there [is] any risk posed by a caregiver who has abused another child," she stated:

"I think that's a little bit harder to say definitively. I think, if someone has been abusing a different child, that definitely suggests that their judgment is suboptimal. But I wouldn't say that *** if somebody is abusing one child,

then they're definitely going to abuse every child they're around. There is just not data to support that."

When asked to elaborate on how judgment impacts the risk for child abuse and neglect, Heavilin testified that,

"just in general *** impaired judgment can impact a care-giver's ability to identify threats, identify potential harms to a child ***. It's kind of hard to quantify without *** a specific situation, but that's kind of *** what I meant by impaired judgment. Like, making decisions that may not necessarily prioritize the child's safety and wellbeing."

When asked if she knew anything about A's case that would put her at risk for abuse or neglect, Heavilin offered the following explanation:

"I know that this child was in an environment where there [are] allegations of misconduct by her parents with a minor. And *** I don't know the details in terms of how old [A] was when that would have been happening or where she would have been in the house when that was happening.

"But, even if she wasn't present while the concerning contact may have occurred, we know that children who hear things happening—abuse or violence or things like that in the home—experience psychological maltreatment.

"And, so it's hard to know. *** [A] did not share any details regarding her parents' behavior while she was at KIDS Center.

"But, just based on the reports regarding why she was not in her parents' care, that was a concern, as well."

However, Heavilin had not examined A and could not "say that it has happened to her specifically."

Father called Encinas, a certified sex offender ther-apist who had been hired to conduct a psychosexual evalua-tion of him. She explained that she would be using a test that would measure father's risk of reoffending and any potential treatment needs, based on an assessment of past history, including convictions, mental health issues, past and cur-rent drug use, the charges, as well as interviews. Encinas was awaiting further documents, including from DHS, so, not having completed her assessment, she was unable to "deduce or measure any kind of risk to the children directly

from [father]." However, based on the information she had reviewed so far, she indicated that she was "not finding any indicators of emotional, physical, or sexual harm being imminent to these children." She based that opinion on several hours spent interviewing and consulting with father, as well as her review of the police reports and charging instrument, the video-recorded interview of K. H., the reports from DHS and the court, behavioral health assessments of A and S, and letters from father's sex offender treatment therapist and drug and alcohol counselor. Encinas also opined that father "is amenable to treatment."

Father had obtained a mental health assessment, which was admitted as an exhibit, and had attended three sex offender treatment sessions. His treatment therapist submitted a letter stating that father

"has shown insight to his dynamic risk factors and has been reflective in thinking distortions. [Father] is open and engaged throughout each session and eager to utilize treatment tools and insights. [Father] has shown progress in each session and I believe he will continue to follow that pattern."

Father had also engaged in drug and alcohol counseling, provided a negative urinalysis test from some months before the hearing, and testified that he had not drank alcohol since October 2019 because a condition of his release agreement prohibits the use of alcohol. He indicated that he had significantly reduced his drinking in 2016 and "[v]ery rarely" drank during the past two or three years. He testified that he drank "[v]ery little" when the children were in the home, and never in excess when they were around, and that he last used marijuana four years ago.

The juvenile court found that DHS had proved the allegations in the petition related to A and S and took jurisdiction over them. In a letter opinion, the court found as follows:

"The overwhelming evidence in this case is that [father] and [stepmother] have engaged in a pattern of behavior throughout approximately 2015-2017 of sexually grooming and supplying cannabis and alcohol to adolescent/teenage girls, and sexually abusing them. * * *

"This court is not persuaded that because [father and stepmother] have purportedly not engaged in sex abuse of a child after 2017, they do not *continue* to pose a risk of harm sufficient for the juvenile court to exercise jurisdiction. The proof of the chain of events points to the existence of current risk. There is nothing to demonstrate that [father's and stepmother's] thinking errors and belief systems regarding appropriate sexual behavior and boundaries with adolescent/teenage girls are any different now than they were in 2017, and [A and S] *** fall squarely within [father's and step-mother's] class of victims. ***

"Regarding [father], the *** testing as a predictor of recidivism based on arrests and convictions, does not satisfy this Court's concerns regarding the thinking errors and predatory behavior of [father]. Moreover, it was not completed as of the time of trial. And while [father] has enrolled in a 'sexual boundary' curriculum of some kind, he had not completed it as of the time of trial and it was not clear to the court specifically what he was learning to address the specific risks in this case. Importantly, [father's] testimony regarding alcohol and cannabis use was not credible. [Father] presented during his testimony as amused, smug, and at times, overly solicitous.

"* * * * *

"[T]he Court finds that these facts present a non-speculative risk of harm to [A and S] of physical/sex abuse by [father and stepmother]. It is important to note that the Court does not need to wait for [A and S] to be *actually harmed* before the Court may intervene. ***"

(Emphases in original.)

Father filed a notice of appeal. Subsequently, father was charged with one count of second-degree sexual abuse and one count of furnishing alcohol to a person under 21 years of age for his conduct related to the second victim, L.W. Pursuant to guilty pleas, father was convicted of two counts of second-degree sexual abuse, one count of third-degree sodomy, and one count of furnishing alcohol to a person under 21 for his conduct related to both K.H. and L.W. The court recommended, as reflected in the judgments, that a condition of father's post-prison supervision include that he have no contact with minors with the exception of

his own minor children. Later, mother was granted sole legal custody of A and S. As a result, mother filed motions to dismiss jurisdiction and terminate wardship. The court granted mother's motions and entered judgments terminating wardship over both A and S, finding that, due to mother obtaining legal custody, she "has ameliorated the original basis of jurisdiction."

We must first address whether father's appeal is moot. DHS asserts that, as a result of the court terminating wardship over A and S, father's appeal is moot such that any decision we might make will have no practical effects on the parties' rights. *See Dept. of Human Services v. A. B.*, 362 Or 412, 426, 412 P3d 1169 (2018) (providing that the party moving to dismiss an appeal as moot must establish that "the decision being challenged on appeal will have no further practical effect on the rights of the parties"). Father objects to dismissal, arguing that it was the jurisdictional judgment that allowed mother to obtain legal custody and that a reversal of the jurisdictional judgment could allow father to regain custody rights to his children. *See id.*, 362 Or at 426 (explaining that the parent must "identify any continuing practical effects or collateral consequences that, in the parent's view, render the appeal justiciable"). We agree with father that the appeal is not moot.

Father's asserted consequence—that the jurisdictional judgment could affect a court's custody or parenting-time decision—is a valid concern. The jurisdictional judgment found that father presented a safety risk to A and S as a result of his criminal activities, which included sexual conduct toward other children. Therefore, the juvenile court found that father was unable to adequately care for A and S under ORS 419B.100.[2] That conclusion could impact a court's custody and parenting-time decision. *See Dept. of Human Services v. K. W.*, 307 Or App 17, 21, 476 P3d 107 (2020), *rev den*, 368 Or 347 (2021) (concluding that the juvenile court determination that the mother was unable to care for the child under ORS 419B.100 "could have [a] bearing on a

---

[2] Subsequent to the pertinent events in this case, ORS 419B.100 was amended. *See* Or Laws 2020, ch 14, § 27 (Spec Sess). However, because the amendments do not affect the issues in the case, we refer to the current version of the statute.

custody and parenting time decision" sufficient to overcome DHS's burden of showing that appellate decision would have no practical effect on the parties' rights); ORS 107.101(1) (providing that one of the policies in approving a parenting plan is to "[a]ssure minor children of frequent and continuing contact with parents who have shown the ability to act in the best interests of the child"); *Dept. of Human Services v. G. D. W.*, 353 Or 25, 30-31, 292 P3d 548 (2012) (concluding that termination of wardship did not render the appeal moot; "the court's custody and parenting time decision likely was premised on the sexual abuse findings that the court incorporated into the jurisdictional and aggravated circumstances judgments. If the findings and judgments were to be vacated, father's ability to reopen the custody and parenting time judgment might be positively affected."). Indeed, father asserts that the juvenile court judgments that he challenges in this case have already affected his custodial rights. Therefore, father has identified a collateral consequence sufficient to overcome DHS's burden of showing that the appellate decision would have no practical effect on the parties' rights.

DHS disagrees, arguing that father's asserted consequence is insufficient to prevent the issue from being moot. *See A. B.*, 362 Or at 426 (once appellant parent identifies a continuing practical effect or collateral consequences making the appeal justiciable, DHS must then "meet its burden of persuasion [to] *** demonstrate that the effects or consequences that the parent identifies are either legally insufficient or factually incorrect." In DHS's view, "it is hard to imagine how a proven allegation of child abuse in a juvenile dependency case would have any greater detrimental impact in a domestic relations case than a criminal conviction for sexual abuse of a minor." The dissent takes a similar view.

We are not persuaded by DHS's argument. First, the criminal conduct for which father pleaded guilty did not involve A and S; it involved different children. Second, the dependency petitions allege that father's criminal conduct and sexual abuse of another child (the same conduct underlying father's criminal conduct) created a risk of harm to A and S sufficient to support dependency jurisdiction. In

other words, any risk to A and S as alleged by DHS was directly tied to father's criminal conduct. A reversal of the jurisdictional judgments would effectively convey to the custody court that DHS failed to meet its burden to establish that father's criminal conduct in fact created a risk of harm to A and S. Thus, given the nexus between the criminal conduct and the alleged risk of harm to A and S as asserted in the dependency petitions, we cannot say that reversal of the jurisdictional judgments in this case would have no effect on a court's decision to modify, at a minimum, father's parenting time of A and S, or, at the other end of the spectrum, the custody decision.

DHS also contends that any collateral consequence associated with father's domestic relations case is speculative, noting that mother has already obtained full custody of the children. To the extent that DHS is arguing that, because the court has already decided custody, a reversal of the judgment will have no practical effects on father's custodial rights, that argument has no merit. A parent may always seek to modify custody and parenting-time judgments. *See* ORS 107.135(1)(a) (providing court with the authority to set aside, alter, or modify a judgment of dissolution of marriage regarding custody, parenting time, visitation, or support of minor children). As to DHS's speculative argument, for the reasons already explained, father met his burden to identify a consequence to his custody case from the jurisdictional judgments. It is DHS, as the party with the burden of persuasion, who at this point has failed to persuade us that father's identified collateral consequence is legally insufficient or factually incorrect. *See A. B.*, 362 Or at 426-27 ("An appeal is not moot unless the party moving for dismissal persuades the appellate court that the dismissal is warranted."); *id.* at 426 ("It will be up to the appellate court to determine the existence and significance of those effects or consequences and to decide, as a prudential matter, whether an appeal is moot."). Thus, we conclude that the appeal is not moot, and we proceed to the merits.

On appeal, father argues that DHS failed to present sufficient evidence to establish the jurisdictional bases asserted in the petition. A juvenile court may assert

dependency jurisdiction over a child if the child's "condition or circumstances are such as to endanger the welfare of the [child] or of others." ORS 419B.100(1)(c). To endanger the child's welfare, the conditions or circumstances must create a current threat of serious loss or injury to the child and there must be a reasonable likelihood that the threat will be realized. *Dept. of Human Services v. S. A. B. O.*, 291 Or App 88, 99, 417 P3d 555 (2018). "The focus must be on the child's current conditions and circumstances and not on some point in the past." *Id.* (internal quotation marks omitted). DHS has the burden to prove, by a preponderance of the evidence, that the threat is current, nonspeculative, and causally related to the allegedly risk-causing conduct or circumstances. *Dept. of Human Services v. D. W. M.*, 296 Or App 109, 118, 437 P3d 1186 (2019). "The key inquiry is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. G. J. R.*, 254 Or App 436, 443, 295 P3d 672 (2013).

Beginning with the allegations related to father—that his involvement in criminal activities and sexual abuse of another child interferes with his ability to safely parent A and S—father contends that the evidence was insufficient to establish a nexus between his criminal activity and sexual abuse of another child and a current and nonspeculative risk of serious loss or injury to A and S. Further, he argues that the evidence was insufficient to support the trial court's findings that A and S were in the same class as father's victims, who were not relatives and were several years older at the time of the charged incidents than A and S are now. DHS disagrees, relying primarily on *State ex rel Juv. Dept. v. Brammer*, 133 Or App 544, 892 P2d 720, *rev den*, 321 Or 268 (1995). We agree with father.

We begin by noting that we accept the unchallenged finding that father sexually abused K. H. and L. W. and provided them with marijuana and alcohol. Thus, our task is to determine whether the evidence was sufficient to establish that his conduct—sexual abuse of a minor and criminal activities (sexual abuse of a minor, furnishing alcohol to persons under 21, and providing marijuana to a minor) created a risk of, as the juvenile court found, "physical/sex

abuse" to his own children, A and S.[3] We conclude that it was not.

First, the record does not establish a nexus between father's sexual abuse of K. H. and L. W. and a risk of harm to A and S. We have previously explained that "a person's status as a sex offender does not *per se* create a risk of harm to a child." *G. J. R.*, 254 Or App at 445. "[T]here must be some nexus between the nature of the prior offense and a current risk to the child at issue." *Id.* In those cases where we have previously concluded that the record supported a risk of harm to a child from a parent's sexual abuse of another child, DHS had presented some evidence establishing the existence of such a risk. *See Dept. of Human Services v. C. T.*, 288 Or App 593, 596, 601, 606-07, 406 P3d 191 (2017), *rev den*, 362 Or 545 (2018) (concluding that a grandfather posed a risk to his 11-year-old grandson from his sexual abuse of grandson's seven-year-old sister, and abuse of his own daughters 40 years earlier, where a clinical social worker testified that the grandfather "posed a risk of harm to any child in his home given his history"); *Dept. of Human Services v. M. H.*, 256 Or App 306, 308-14, 328, 300 P3d 1262, *rev den*, 354 Or 61 (2013) (concluding that evidence was sufficient to establish that father's prior sexual abuse of minors created a risk of harm to his own daughter where a certified clinical therapist testified to the risks that untreated sex offenders pose to children and that, based on a risk assessment of father and other records, father "has not remediated his condition"); *State ex rel Dept. of Human Services v. L. C. J.*, 212 Or App 540, 546, 159 P3d 324 (2007) (concluding that mother's engagement to an untreated sex offender created a risk of harm to her daughter, because he had "previously been adjudicated of a sex offense and was at least accused of victimizing a girl close to child's age," and "according to [testimony of the mental health therapist]

---

[3] We note that DHS does not allege that father's failure to protect A and S from stepmother's conduct created a risk to them. The dependency petitions focused solely on father's conduct, and mother's failure to protect the children from that conduct, as a basis for the harm to A and S. Further, both below and on appeal, father's conduct remains the focus of DHS's arguments. Therefore, we do not consider whether the evidence would be sufficient to support jurisdiction under the theory that father failed to protect A and S from stepmother.

\* \* \* he would be likely to reoffend"); *State ex rel Juv. Dept. of Human Services v. T. S.*, 214 Or App 184, 186-87, 195-96, 164 P3d 308, *rev den*, 343 Or 363 (2007) (concluding that DHS presented sufficient evidence of a reasonable likelihood of harm to the welfare of the mother's three sons where the mother's daughter (the father's adopted daughter) accused the father of sexually abusing her; the father was previously investigated for sexually abusing his biological daughter and stepdaughter; the mother did not believe any of those allegations, including daughters' allegation; and the mother admitted that her sons might be at risk if the allegations were true but nonetheless did not investigate and remained loyal to the father).

Here, the evidence showed that A and S were present in the home during some of the abuse but were unaware that it was occurring and were not themselves subjected to sexual abuse or any other criminal activity. Further, Heavilin testified that, although a caregiver's sexual abuse of a minor indicates poor judgment, which can prevent the caregiver from identifying potential threats or harms, there is no data to support the proposition that, "if somebody is abusing one child, then they're definitely going to abuse every child they're around." Finally, both children were diagnosed with adjustment disorders, but related to the removal from father's and stepmother's care and not father's and stepmother's conduct. Absent from that evidence is anything connecting father's sexual abuse of other children to a risk that he would sexually abuse his own children.

DHS appears to rely on a presumption that father's sexual abuse of minor children created a risk that he would sexually abuse his own daughters. However, its own evidence established that no data supports such a presumption, and we have previously declined to apply such a presumption. *See Dept. of Human Services v. B. B.*, 248 Or App 715, 727, 274 P3d 242, *adh'd to on recons*, 250 Or App 566, 281 P3d 653 (2012) (noting that "there is no presumption that father's failure to complete treatment some 11 years before the jurisdictional hearing, by itself, makes father 'an unremediated sex offender,' who in turn would be presumed dangerous to his children," and that such a "result is at odds

with the proof requirement under ORS 419B.100(1)(c)"). Further, Heavilin's generalized statements about a caregiver's poor judgment are not sufficient to support an inference that the caregiver will sexually abuse a child. *See Dept. of Human Services v. A. F.*, 243 Or App 379, 381, 384, 387, 259 P3d 957 (2011) (concluding that the juvenile court erred in finding that a father posed a risk to his children from his possession of pornography; although an expert testified to general risks from possession of pornography and that he had concerns regarding the amount of pornography father possessed and its "'potential risk,'" he also "emphasized that the fact that a person possesses pornography or engages in behavior relating to pornography that is outside the norm does not, in and of itself, mean that the person will commit a sexual offense"). Likewise, Heavilin's generalized testimony that a child may be at an increased risk of experiencing all forms of abuse when a caregiver abuses alcohol or marijuana, without more, is insufficient to connect father's use of alcohol and drugs to an increased risk that he would sexually abuse A and S.

Further, although the juvenile court found that A and S "fall squarely" within father's class of victims, "adolescent/teenage girls," DHS did not present any evidence establishing that a sexual offender's interest in 14-, 15-, and 16-year-old girls increases the risk that the offender will sexually abuse 10- and 11-year-old girls, nor was there any evidence that an offender's interest in nonrelative minors increases the risk that the offender will sexually abuse the offender's own children. We have previously declined to infer without any evidence that a parent's abusive behavior toward nonrelative teenagers means that the parents will abuse their own younger relatives or children. *See G. J. R.*, 254 Or App at 441, 445 (concluding that there was "no evidence from which a reasonable factfinder could find that [father's daughter] fits within the class of father's victims" from his past criminal conduct of masturbating in public, including at a school); *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 516 n 4, 209 P3d 810 (2009) (explaining that father's 13-year-old conviction for the statutory rape of two girls, ages 13 and 14, "does not necessarily demonstrate a propensity *** to be a threat to his toddler son");

*State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 153-55, 158-59, 211 P3d 293 (2009) (declining to infer that mother's brother, who had sexually abused a 16-year-old girl in the past and did not complete sex offender treatment, was a risk to mother's, at the time of the hearing, approximately three-year-old daughter); *State ex rel SOSCF v. Burke*, 164 Or App 178, 181-88, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000) (declining to infer without evidence that the father's conduct of sexually abusing teenage females before the birth of his 2- and 3-year-old daughters was a "conduct or condition that [was] seriously detrimental" to the daughters for purposes of termination of the father's parental rights). *See also M. H.*, 256 Or App at 308-09, 316-17 (in a dependency case in which the juvenile court took jurisdiction over father's daughter based in part on his prior sexual abuse of minor girls, competing expert testimony was presented on the risk that a person who sexually abuses a nonrelative minor may pose to his own children; one opined that "bonding and attachment are relevant to the risk and that 'people have very different levels of bonding and attachment to their own children than they do to even siblings or other relatives'"; another expert disagreed, opining that, "being related to a child is 'an inhibitor' for most people," but for "'sex offenders who have already broken boundaries, and broken severe boundaries, it's not a big step'"); *B. B.*, 248 Or App at 727 ("[T]here is no presumption that father's failure to complete treatment some 11 years before the jurisdictional hearing [related to the sexual abuse of minor children], by itself, makes father 'an unremediated sex offender,' who in turn would be presumed dangerous to his children."). We do not mean to suggest that a record could not be made establishing that a sex offender whose victims are adolescents and nonrelatives poses a risk of sexual abuse to that offender's younger relatives. Rather, we simply conclude that there must be some evidence from which to make the necessary inferences.

In the end, the only evidence about a risk of harm to A and S were their diagnoses with adjustment disorders, and that was due to their removal from the care of father and stepmother. Without some evidence to support how and why A and S would fall within father's class of victims or

to suggest a risk that he would abuse them, DHS failed to establish the necessary nexus to support jurisdiction.

The state disagrees, contending that this case is controlled by *Brammer*, 133 Or App 544. There, we reversed a juvenile court order denying jurisdiction based on the mother's sexual abuse of her son's friend in her home approximately 25 times when he was eight and nine years old. *Id.* at 547. She would sometimes call the victim inside when he was playing outside with other children or wake him when he was sleeping in the living room with her son, to sexually abuse him. *Id.* After eight months of the abuse, the victim told his mother, leading to criminal charges and DHS involvement. *Id.* at 547-48.

In concluding that, contrary to the juvenile court's determination, the evidence was sufficient to establish that the mother was a risk to her own son as necessary to support jurisdiction, we first noted that "a child may be removed from an abusive environment if there is evidence of abuse of *any* child." *Id.* at 549 (emphasis in original). In that case, we emphasized the following:

> "Mother exploited her role as [the victim's] care giver for the sake of her own sexual gratification. [The victim] was her son's best friend. The abuse took place in her children's home on a number of occasions over a period of eight months, when her own children and other children were in or around the home. We are unmoved by mother's claim that jurisdiction is not warranted because there is no proof that she acted inappropriately toward her own children. The court is not required to wait until other minors in the home are exploited before intervening to protect them."

*Id*.

The state argues that *Brammer* establishes that a parent's sexual abuse of a nonrelative child can create a reasonable likelihood of harm to the parent's own children, even where there is no evidence of sexual abuse of the parent's children. And here, according to the state, the evidence established a current, nonspeculative risk of harm to A and S where father and stepmother befriended teenage girls at church and proceeded to abuse them in the home

while providing them with marijuana and alcohol, at times when A and S were in the home. Further, as in *Brammer*, the state argues that father and stepmother "used their role as parents to ask K. H. \*\*\* to babysit for their children, only to then exploit that relationship for their own sexual gratification."

We do not read *Brammer* to control the outcome here. We begin by noting that *Brammer* applied the *de novo* standard of review and not the one that governs this case, legal error, where we "review the evidentiary record to determine whether any evidence, and the inferences that reasonably can be drawn from the evidence, supports the juvenile court's findings." *M. H.*, 256 Or App at 327. Moreover, here, unlike in *Brammer*, DHS presented affirmative evidence that no data supports a presumption that a person's sexual abuse of one child indicates that the person will sexually abuse all children. Also unlike in *Brammer*, where the abuse was occurring shortly before DHS intervention, 133 Or App at 547, the last incident of abuse here occurred roughly three years before the jurisdictional trial.

To the extent that DHS reads *Brammer* as establishing a presumption that abuse of one child always establishes a risk to all children in the household, our more recent non-*de-novo*-review cases hold otherwise. As we have explained, there simply is no presumption that a person's sexual abuse of one child creates a *per se* risk to all children. Further, while it is true that an abusive environment to "any child" may create a harmful environment to other children in the home, we have also held that the "'harm to one child means a risk to the others' axiom is not absolute and immutable" and must take into account the unique circumstances of each child. *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 311-15, 121 P3d 702 (2005) (concluding that a parent's medical neglect of one child who had special needs did not create a risk of harm to other children who did not have the same special needs, where there was no evidence that parents otherwise medically neglected them). DHS has the burden to establish that, on the particular facts of each case, the asserted risk is indeed present. *Brammer* does not compel a different outcome.

DHS also failed to establish a current, nonspeculative risk of harm to A and S. The juvenile court rejected Encina's testimony that she did not see "any indicators of emotional, physical, or sexual harm being imminent" to A and S from father, and was unmoved by father's engagement in and compliance with sexual offender treatment because the treatment was not yet completed and it was not clear what father was learning from it. Further, the juvenile court did not credit father's testimony regarding his current use of alcohol and marijuana. The juvenile court based its finding that father posed a risk of harm to A and S on its view that "[t]here is nothing to demonstrate that [father's and stepmother's] thinking errors and belief systems regarding appropriate sexual behavior and boundaries with adolescent/teenage girls are any different now than they were in 2017."

The juvenile court's finding lacks a sufficient basis on this record. First, father's "thinking errors and belief systems" which the juvenile court found were not yet remediated were related to father's conduct against other minors—conduct which does not, on this record, sufficiently establish a risk that father would sexually abuse A and S. Second, the last incident of abuse occurred three years before the jurisdictional hearing, and DHS presented no evidence explaining why father's past conduct established a current, nonspeculative risk of harm to A and S. *See Dept. of Human Services v. M. E.*, 255 Or App 296, 298, 305, 308, 311, 297 P3d 17 (2013) (concluding, on *de novo* review, that the evidence was insufficient to establish a current risk of harm to the child and her sister where an expert had testified that father did not pose a risk and "[t]here is no hint in the record that there has been any sexual behavior by stepfather toward [the child] since the one incident [four years earlier], even though the incident of abuse was not disclosed and, consequently, there was no intervention"); *B. B.*, 248 Or App at 719-20, 722-23, 726-28 (concluding, on *de novo* review, that the record was insufficient to establish that father's sexual abuse of minors, viewing of child pornography, and his failure to complete treatment made him an "un-remediated" risk of sexually abusing his own children, where the last incident of abuse occurred 16 years before the jurisdictional

hearing, and there was no evidence that he had abused his own children). We do not foreclose the possibility that DHS could have presented sufficient evidence of a current risk of sexual abuse from past sexual abuse even though no abuse occurred within three years of the hearing; nevertheless, "[j]urisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains." *Dept. of Human Services v. M. Q.*, 253 Or App 776, 787, 292 P3d 616 (2012). As we have repeatedly emphasized, DHS "must prove that there is a *current* risk of harm and not simply that the child's welfare was endangered at some point in the past." *Dept. of Human Services v. M. M.*, 277 Or App 120, 123, 370 P3d 878 (2016) (emphasis in original; internal quotation marks omitted). Thus, even disregarding Encina's testimony, father's testimony regarding his use of alcohol and marijuana, and the evidence presented of his engagement in and compliance with sex offender treatment, DHS failed to establish a nonspeculative and current risk of harm to A and S.

We therefore conclude that the record does not support a nexus between father's sexual abuse of two teenage girls and a risk of harm to his daughters or a risk of harm that is current and nonspeculative.

Father next argues that the juvenile court erred in ruling that mother's inability to protect the children from father's criminal activities forms a basis for dependency jurisdiction. Father first argues that he may challenge jurisdiction based on mother's admission because the juvenile court's findings related to father were "dependent [on] mother's admission that she is unable to protect the children from father's criminal activities." Further, father argues that, even if we were to conclude that father's criminal activities warranted juvenile court jurisdiction, mother's admission that she could not protect the children from father's criminal activities due to a lack of custody is insufficient to justify jurisdiction as to her. DHS responds that the juvenile court correctly concluded that father's criminal conduct and mother's admitted inability to protect the children from that conduct presents a current, nonspeculative risk of harm to

A and S. DHS does not otherwise respond to father's contention that a lack of a custody order is insufficient to support jurisdiction. We agree with father.

A parent may admit facts to support dependency jurisdiction, but an admission is not necessarily conclusive evidence to establish an allegation. *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 399, 328 P3d 769 (2014) (concluding that a "juvenile court can consider the admission by one parent as a fact in determining whether DHS proved the admitted allegation, but it cannot conclusively establish that allegation"). Rather, the juvenile court must determine whether, "under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *G. J. R.*, 254 Or App at 443.

Here, the record does not establish that father's criminal activities created a risk to the children sufficient to support jurisdiction as previously explained; thus, mother's inability to protect A and S from father due to a lack of a custody order cannot provide a basis for asserting jurisdiction over the children as to her. However, even if we were to conclude otherwise, the record is insufficient to demonstrate that mother could not protect A and S because she did not have full custody. Regarding a lack of custody, mother conveyed her willingness and ability to care for A and S; at the time of DHS's initial involvement she was caring for them, and DHS and the court found her to be safe and appropriate in February 2020. There was no evidence that father could or would demand that mother return the children to him if they were in her care or that, in such a situation, his conduct would pose a risk to them in some other way. Therefore, despite her admission, the record does not support a finding that mother was unable to protect A and S from father's conduct. *See Dept. of Human Services v. J. R.*, 274 Or App 107, 112, 360 P3d 531 (2015) ("[W]ithout evidence that the fit parent is unable to protect the children, the lack of [a] custody order is insufficient to support jurisdiction."); *Dept. of Human Services v. M. F.*, 294 Or App 688, 696, 432 P3d 1189 (2018) (the father's lack of full custody of the child was insufficient to establish jurisdiction where there was no evidence that the mother was "in a position to

insist that father deliver child to her; nor *** evidence that she is likely to make such a demand or that father would be unable to resist it"). The trial court erred in concluding otherwise.

In summary, the evidence was insufficient to establish that father's sexual abuse of minors or criminal activity created a risk of harm to A and S, or that mother could not protect children from father's conduct due to a lack of custody. Accordingly, the evidence does not establish grounds for jurisdiction.

Reversed.

**POWERS, J.,** dissenting.

In my view, father's guilty pleas to—and subsequent convictions of—multiple sex crimes involving minors while this dependency proceeding was under advisement renders this appeal moot. Because I would conclude that the Department of Human Services (DHS) has carried its burden to demonstrate that the "effects or consequences that the parent identifies are *** legally insufficient" to render the appeal justiciable, *Dept. of Human Services v. A. B.*, 362 Or 412, 426, 412 P3d 1169 (2018), I respectfully dissent.

Despite father's contention that the jurisdictional judgments could impact a court's custody or parenting-time decision, I would conclude that DHS has carried its burden to demonstrate that those potential effects or consequences are legally insufficient to establish justiciability. As an initial matter, the felony convictions for sex crimes against multiple minors and a separate conviction for furnishing alcohol to a minor create similar social stigma—if not more—than the jurisdictional judgments in this case. Similarly, it is difficult to see any possibility of the jurisdictional judgments having any collateral consequences associated with his domestic relations case given father's convictions. Although it is true that the underlying criminal conduct involves different, nonrelative children and not the children involved in this dependency proceeding, father's criminal acts nonetheless involved minors and those convictions come with their own direct and collateral consequences. More to the point, mother already has been awarded custody, and father

has been sentenced to a significant period of incarceration followed by a period of post-prison supervision. Thus, although it is conceivable that the dependency judgments may be used in a proceeding where father raises a change of circumstances to modify the existing custody order, that potential effect is negligible in light of the criminal convictions. Accordingly, because I would conclude that DHS has carried its burden on mootness, I would dismiss this case without reaching the merits.

I respectfully dissent.