650 December 7, 2023 No. 34

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of P. J. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*
*and*

P. J. N.,
*Respondent on Review,*

*v.*

T. J. N.,
*Petitioner on Review,*
*and*

D. L. P.,
aka D. L. P.,
*Petitioner on Review.*

(CC 21JU03559, CA A178300 (Control))

In the Matter of L. E. N.,
aka L. E. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*
*and*

L. E. N.,
aka L. E. N.,
*Respondent on Review,*

*v.*

T. J. N.,
*Petitioner on Review,*
*and*

D. L. P.,
aka D. L. P.,
*Petitioner on Review.*

(CC 21JU03560, CA A178305)

In the Matter of P. R. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Respondent on Review,*
*and*

P. R. N.,
*Respondent on Review,*

*v.*

T. J. N.,
*Petitioner on Review,*
*and*

D. L. P.,
aka D. L. P.,
*Petitioner on Review.*

(CC 21JU03561, CA A178307)

(SC S070051 (Control); S070052)

On review from the Court of Appeals.*

Argued and submitted June 22, 2023.

Kristen G. Williams, Williams Weyand Law, LLC, McMinnville, argued the cause and filed the briefs for petitioner on review T. J. N.

Elena C. Stross, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review D. L. P. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Salem.

Inge D. Wells, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review Department of Human Services. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Christa Obold Eshleman, Youth, Rights & Justice, Portland, argued the cause and filed the briefs for respondents on review P. J. N., L. E. N., and P. R. N.

_____

* Appeal from Lane County Circuit Court, Bradley A. Cascagnette, Judge. 323 Or App 258, 522 P3d 914 (2022).

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, and Masih Justices, and Walters, Senior Judge, Justice pro tempore.**

FLYNN, C.J.

The decision of the Court of Appeals is reversed. The appeals are dismissed.

---

** James, J., did not participate in the consideration or decision of this case. Nakamoto, Senior Judge, Justice pro tempore, participated in oral argument, but did not participate in the consideration or decision of this case.

**FLYNN, C.J.**

In these consolidated juvenile dependency cases, parents challenge judgments of the juvenile court that changed the "placement preference" for parents' children from mother's home to "foster care"—substitute care outside of the home. While the appeals were pending in the Court of Appeals, the juvenile court issued multiple decisions that again determined the placement preference for the children to be substitute care, including judgments concerning a second set of dependency petitions. In light of those subsequent judgments, the Court of Appeals dismissed the cases as moot, because it could not conclude "without some speculation" that the challenged judgments would have a practical effect on the parents' rights. *Dept. of Human Services v. T. J. N.*, 323 Or App 258, 268-69, 522 P3d 914 (2022); *see Rogue Advocates v. Board of Comm. of Jackson County*, 362 Or 269, 272, 407 P3d 795 (2017) (explaining that a case becomes moot when, "because of changed circumstances, a decision no longer will have a practical effect on or concerning the rights of the parties" (internal quotation marks omitted)). We allowed review to consider whether the Court of Appeals correctly dismissed the cases as moot. But the juvenile court has since entered judgments dismissing the dependency cases altogether.

Thus, in addition to the question of whether the appeals were moot for the reasons identified by the Court of Appeals, we must also consider whether the additional judgments have caused the appeals to now become moot. We conclude that the "some speculation" standard that the Court of Appeals employed incorrectly excused DHS from its burden to prove that resolution of the appeals would have no practical effect on parents' rights. But we also conclude that DHS has met its burden to prove that the appeals are now moot, and we decline to exercise whatever discretionary authority that ORS 14.175 may afford us to decide the parties' otherwise moot challenge to the merits of the original placement decisions. Accordingly, we reverse the decision of the Court of Appeals and dismiss the appeals as moot. *See Woodland v. Dept. of Rev.*, 371 Or 334, 339, 536 P3d 985 (2023) (affirming Tax Court's dismissal of taxpayer's appeal as moot and

announcing that, "[e]ven if ORS 14.175 might otherwise give this court authority to reach the now moot-arguments (and we do not decide if it does), we would decline to exercise our discretion to address them").

## I.  BACKGROUND

The relatively convoluted procedural posture of these appeals boils down to a few key events in the dependency cases concerning parents' three children, who ranged in age from seven months to six years when the original dependency petitions were filed. Those procedural facts are undisputed.

As pertinent to these appeals, parents admitted to allegations that they had failed to adequately supervise their children, and the juvenile court entered judgments in September 2021 determining that the admissions were sufficient to establish dependency jurisdiction over the children. *See* ORS 419B.100(1)(c) (providing, in part, that "the juvenile court has exclusive original jurisdiction" in any case involving a child "[w]hose condition or circumstances are such as to endanger the welfare of the [child]"). For the most part, the children remained in mother's home, subject to various safety plans, but in March 2022, the juvenile court issued the new "placement preference" judgments that are the subject of these appeals. Those judgments were based on the court's findings that "[m]other cannot or will not comply with the in-home safety plan" and that "[i]t is not in the best interests of the children that they remain with mother at this time as she has not adequately supervised the children consistent with the required plan." Parents appealed those judgments, contending, in part, that the juvenile court had not followed the correct statutory process for changing the children's placement to substitute care.

Three months later, while parents' appeals concerning that placement change were pending, the Department of Human Services (DHS) filed a second set of dependency petitions in which it alleged additional jurisdictional bases. In response to the new petitions, the juvenile court issued additional orders and judgments in which it again made findings that placement outside of the home was in the best

interest and for the welfare of the children. Eventually, based on parents' admissions to the allegations in the new set of petitions, the juvenile court issued additional jurisdictional judgments.[1] Thereafter, in late 2022, the juvenile court issued permanency judgments concerning both sets of dependency petitions. Those permanency judgments continued the placement preference as substitute care and included findings that such care was "necessary and * * * in the [children's] best interests" because they "cannot be safely returned to a parent today."

DHS sought to dismiss as moot parents' appeals of the original substitute-care placement judgments. DHS argued that reversing the original judgments would have no practical effect on parents' rights, because "subsequent events [had] overtaken" them (*i.e.*, the juvenile court had subsequently decided that substitute care was the children's proper placement in the decisions concerning the second set of dependency petitions). Although parents did not disagree with DHS about the effect of the new dependency petitions, they argued that their appeals of the challenged judgments were not moot, because those judgments added three months to the amount of time that the children spent outside of the home in substitute care. Parents pointed to a general statutory requirement under ORS 419B.498(1)(a) that DHS file a petition to terminate parental rights (TPR petition) when children have been in substitute care for 15 of the most recent 22 months. They argued that their appeals of the original substitute-care placement judgments continued to have a practical effect on their rights, in part because a decision regarding the challenged placement determination would affect how many months were left on the termination clock.

---

[1]  Those judgments included the following placement and custody findings:

"**Out-of-Home Placement:**

"* * * Placement or continuation in substitute care is in the child's best interest and for the child's welfare, based on the jurisdictional findings under ORS 419B.100 and because the child cannot be safely returned home/maintained in the home without further danger of suffering physical injury or emotional harm or endangering or harming others. Additional findings: ORS 419B.337(1).

"The court further finds that it is in the child's best interest and welfare to be placed * * * in the legal custody of [DHS] for substitute care[.]"

(Boldface and underscoring in original.)

After briefing and oral argument, the Court of Appeals issued its precedential opinion dismissing parents' appeals as moot. The Court of Appeals held that the identified collateral consequence did not prevent the cases from being moot, because "there are too many variables that go into whether and when a TPR petition must be filed to conclude without some speculation what practical effects dismissal might have" on whether DHS would have an obligation under ORS 419B.498(1) to file a petition to terminate parental rights. *T. J. N.*, 323 Or App at 268-69. The court then assumed, without deciding, that it had discretion to decide the otherwise moot cases under ORS 14.175, but it summarily declined to do so. *Id.* at 270.

The parties' original briefing in this court addressed whether the Court of Appeals had correctly dismissed the cases as moot. It then came to our attention that the juvenile court had since dismissed the dependency petitions altogether, so we invited supplemental briefing on the question of whether the cases are *now* moot, even if they had not previously been moot in the Court of Appeals. Turning to those questions, we will explain why we disagree with the Court of Appeals' approach to the question of mootness but are persuaded that DHS has met its burden in this court to prove that the cases are now moot.

## II.  ANALYSIS

As we have explained, "[w]hether a case is moot depends on whether a justiciable controversy exists." *Rogue Advocates*, 362 Or at 272. A justiciable controversy requires both that the interests of the parties are adverse and that a decision on the "matter will have some practical effect on the rights of the parties to the controversy." *Rains v. Stayton Builders Mart, Inc.*, 359 Or 610, 624, 375 P3d 490 (2016) (internal quotation marks omitted). Thus, "[g]enerally speaking, a case becomes moot when a court's decision will no longer have a practical effect on the rights of the parties." *State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018) (internal quotation marks omitted).

This "court is not necessarily required to dismiss moot cases, 'at least not in public actions or cases involving

matters of public interest.'" *Rogue Advocates*, 362 Or at 272 (quoting *Eastern Oregon Mining Association v. DEQ*, 360 Or 10, 15, 376 P3d 288 (2016) (some internal quotation marks omitted)); *see also Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015) ("We * * * do not hold that moot cases will no longer be subject to dismissal. We hold only that Article VII (Amended), section 1, [of the Oregon Constitution] does not *require* dismissal in public actions or cases involving matters of public interest." (Emphasis in original.)). But "when it becomes clear that resolving the merits of a claim will have no practical effect on the rights of the parties," this court may dismiss the case. *Dept. of Human Services v. P. D.*, 368 Or 627, 631, 496 P3d 1029 (2021).

As a practical matter, our mootness cases in recent years often have turned on the requirement that the party moving for dismissal bears the burden of establishing that resolving the case will have no practical effect on the rights of the parties. *See, e.g.*, *Dept. of Human Services v. A. B.*, 362 Or 412, 426-27, 412 P3d 1169 (2018) (describing burden and explaining why court was persuaded that DHS had met its burden). In both the Court of Appeals and in this court, DHS attempted to meet that burden by relying on subsequent decisions in the dependency cases to establish that reversing the original substitute-care judgments would have no practical effect on the parties.

The moving party's burden to prove that resolving the case will have no practical effect "includes the burden of establishing that any collateral consequences either do not exist or are legally insufficient." *K. J. B.*, 362 Or at 786 (citing *A. B.*, 362 Or at 426). The moving party is not "required to imagine all possible collateral consequences and then disprove each of them." *Id.* Rather, the nonmoving party must identify "any collateral consequences that he or she contends has the effect of producing the required practical effects of a judicial decision." *Id.* Once the nonmoving party does so, the party moving for dismissal must demonstrate that "those identified collateral consequences either [do] not exist or [are] legally insufficient." *Id.*

Ultimately, "[i]t will be up to the appellate court to determine the existence and significance" of the identified

collateral consequences. *A. B.*, 362 Or at 426; *see also Garges v. Premo*, 362 Or 797, 802, 421 P3d 345 (2018) ("Whether a case has become moot will depend on a factual determination regarding the potential impact of the court's decision on the parties."). But unless the moving party "persuades the appellate court that the dismissal is warranted," the appeal is not moot. *A. B.*, 362 Or at 427.

A.    *Whether DHS Met Its Burden in the Court of Appeals*

In the Court of Appeals, DHS pointed to the juvenile court's placement orders following the new dependency petitions as demonstrating that a reversal of the first substitute-care placement determination would have no practical effect on the parties. The Court of Appeals agreed, describing the original placement judgments as having been "superseded" by the new jurisdictional judgments. *T. J. N.*, 323 Or App at 269. In doing so, the court relied on an earlier case in which it had held that the appeal of a decision placing siblings in substitute care had become moot after the juvenile court had entered a permanency judgment that again determined that the siblings should remain in substitute care. *Id.* at 269 (discussing *Dept. of Human Services v. J. G.*, 239 Or App 261, 264, 244 P3d 385 (2010)).

We have emphasized, however, that, when an appeal challenges a decision made during the course of a dependency case, even dismissal of the dependency case "does not necessarily render the appeal moot." *A. B.*, 362 Or at 414. Instead, "whether dismissal is appropriate will depend on the particular circumstances presented." *Id.* Here, the circumstances include a statutory timeclock moving certain dependency cases toward a petition to terminate parental rights. Parents identified that timeclock as the source of collateral consequences flowing from the challenged judgments, and parents contended that the collateral consequences produced the required practical effect to prevent the cases from becoming moot. Thus, even assuming that one or more of the juvenile court's subsequent placement decisions for the children "superseded" the judgments that parents were challenging on appeal, the question was whether DHS demonstrated that the identified collateral consequence

"either [did] not exist or [was] legally insufficient."[2] *See K. J. B.*, 362 Or at 786 (describing burden).

It is helpful to briefly describe the operation of the statutory timeclock, ORS 419B.498, before turning to the parties' arguments regarding whether the effect of the juvenile court's placement decision on that statutory timeclock qualifies as a collateral consequence that prevented the cases from being moot in the Court of Appeals. ORS 419B.498(1)(a) sets out a general timeline that DHS "shall * * * file a petition to terminate the parental rights of a child or ward's parents * * * if," among other things, the child (or ward) "has been in substitute care under the responsibility of [DHS] for 15 months of the most recent 22 months[.]"[3] That filing requirement is not absolute, however. For example, even when a child has been in substitute care for 15 of the most recent 22 months, DHS may not file a TPR petition under ORS 419B.498(1) unless the juvenile court has determined, following a permanency hearing, that the permanency plan for the child should be adoption. ORS 419B.498(3).[4] In addi-

---

[2] Children assert in a footnote in their respondents' brief on the merits in this court that *J. G.*—the case on which the Court of Appeals relied for its conclusion that the challenged placement determinations had been "superseded" and rendered moot—was wrongly decided. They also observe that an initial substitute-care placement "will be reflected in subsequent orders," possibly suggesting that the successive orders were, themselves, a collateral consequence of the challenged placement determinations. We note that the petitions for review did not ask us to address whether the Court of Appeals correctly held that the subsequent placement determinations superseded the challenged determinations or whether the subsequent orders are a collateral consequence that could prevent the cases from being dismissed as moot. Because we ultimately agree with parents' argument that the addition of three months to the TPR timeclock is a collateral consequence that prevented dismissal in the Court of Appeals, we need not resolve whether those questions were properly presented to us or whether the dismissal may have been in error for the reasons identified by children.

[3] ORS 419B.498(1)(a) provides:

"Except as provided in subsection (2) of this section, [DHS] shall simultaneously file a petition to terminate the parental rights of a child or ward's parents and identify, recruit, process and approve a qualified family for adoption if the child or ward is in the custody of [DHS] and:

"(a) The child or ward has been in substitute care under the responsibility of [DHS] for 15 months of the most recent 22 months[.]"

[4] ORS 419B.498(3) provides:

"No petition to terminate the parental rights of a child or ward's parents pursuant to subsection (1) of this section * * * may be filed until the court has determined that the permanency plan for the child or ward should be adoption after a permanency hearing pursuant to ORS 419B.476."

tion, ORS 419B.498(2) provides exceptions to DHS's filing requirement, which include the existence of a compelling reason, documented in the case plan, that filing a TPR petition would not be in the child's best interests.[5]

As noted above, when DHS moved to dismiss these cases in the Court of Appeals, parents responded that the original substitute-care judgments were not moot—even if superseded by new substitute-care orders three months later—because the three months of substitute care resulting from the original judgments would affect how soon DHS would be required to move to terminate parental rights pursuant to the 15-of-the-most-recent-22-month formula under ORS 419B.498(1)(a). DHS did not dispute parents' premise that three months would be subtracted from the TPR time-clock if the Court of Appeals were persuaded that the original placement judgments were erroneous.

---

[5] ORS 419B.498(2) provides:

"[DHS] shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless:

"(a) The child or ward is being cared for by a relative and that placement is intended to be permanent;

"(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c);

"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships;

"(C) If the child is an Indian child, the court finds that tribal customary adoption, as described in ORS 419B.656, is an appropriate permanent plan for the child and the Indian child's tribe consents to the tribal customary adoption; or

"(D) The court or local citizen review board in a prior hearing or review determined that while the case plan was to reunify the family [DHS] did not make reasonable efforts or, if the child or ward is an Indian child, active efforts, as described in ORS 419B.645, to make it possible for the child or ward to safely return home; or

"(c) [DHS] has not provided to the family of the child or ward, consistent with the time period in the case plan, such services as [DHS] deems necessary for the child or ward to safely return home, if reasonable efforts to make it possible for the child or ward to safely return home are required to be made with respect to the child or ward."

Instead, DHS argued that the practical effect of reversing the original placement judgments was "purely speculative." DHS emphasized that there are "other provisions of ORS 419B.498, which authorize [it] to defer filing termination petitions if certain circumstances are present" and that, regardless of the time children spend in substitute care, DHS would not be authorized to file a termination petition until the juvenile court "determined that the permanency plan" for the children should be adoption, citing ORS 419B.498(3). Thus, DHS asserted, it was speculative that the children would remain in substitute care long enough to trigger the requirement for DHS to file a termination petition and that, even if the children reached the 15-of-22-month limit, it was "speculative that DHS would choose to pursue termination of parental rights at that time, and equally speculative that the juvenile court would determine that the children's permanency plans should be changed to adoption." According to DHS, those uncertainties made the appeals moot.

The Court of Appeals agreed, reasoning that "there are too many variables that go into whether and when a TPR petition must be filed to conclude without some speculation what practical effects dismissal might have" on whether DHS would have an obligation under ORS 419B.498(1)(a) to file a petition to terminate parental rights. *T. J. N.*, 323 Or App at 268-69. To explain why DHS ultimately might not file a petition, the court pointed to the fact that the juvenile court's most recent judgment had included "favorable findings about mother's progress and the likelihood that [the] children could be safely returned home to her within a reasonable period of time." *Id.* at 268. The court then reasoned that, "[i]f those findings remain true at some future date when [the] children will have been in substitute care for 15 out of 22 months, they would suggest the existence of a compelling reason under ORS 419B.498(2)(b) for DHS not to file a TPR petition." *Id.* The court added that, if the juvenile court were to continue to make such findings, then "the permanency plan likely would not be changed to adoption," which would mean that DHS could not file a petition to terminate parental rights. *Id.*

In this court, parents insist that they identified collateral consequences on which an appellate decision would

have a practical effect and that the Court of Appeals erred in dismissing the case as moot.[6] Their argument depends, in part, on the shifting burdens that govern a court's assessment of whether a case is moot. According to parents, the Court of Appeals asked the wrong question when it focused on variables that could affect whether and when a TPR petition must be filed under ORS 419B.498. Because of that focus, parents argue, the court failed "to hold [DHS] to its burden to prove that parents would not be prejudiced by the additional three months in the substitute-care calculation" and, instead, incorrectly held that "parents' failure to prove that they would not prevail at the permanency hearing rendered their appeal moot." We agree.

As set out above, once parents identified a collateral consequence that they "contend[ed had] the effect of producing the required practical effects of a judicial decision," it became DHS's burden to demonstrate that the identified collateral consequence "either [did] not exist or [was] legally insufficient." *K. J. B.*, 362 Or at 786. Parents did enough to trigger that additional burden for DHS when they asserted that an answer to whether the children erroneously spent the first three months in substitute care would affect the calculation of when the children reached the statutorily significant measure of 15 months in substitute care. *See A. B.*, 362 Or at 426 ("[T]he appellant parent must identify any continuing practical effects or collateral consequences that, in the parent's view, render the appeal justiciable.").

DHS insists that it met its burden to prove that the cases were moot by identifying exceptions and prerequisites to its obligation under ORS 419B.498 to file a petition to terminate parental rights. In other words, DHS did not dispute that the consequence existed—that reversal of the original placement judgments would affect how soon the children would reach 15 months in substitute care.[7] But it attempted

---

[6] Children have filed their own briefing in this court and argue that "the practical effect correctly identified by parents is that a period of removal accelerates the ticking clock established by ORS 419B.498" so that "the ongoing legal effect of the removal is not speculative."

[7] In this court, DHS raises the possibility that the ORS 419B.498 timeclock includes all time that children spend in substitute care, regardless of whether the placement decision was in error—in other words that parents were wrong that a successful challenge to the placement judgments could have a practical effect

to demonstrate that the consequence was insufficient to prevent the case from being moot by showing that the ultimate significance of the statutory timeclock—DHS filing a petition to terminate parental rights—was speculative. To support that assertion, DHS raised three possible alternatives in the Court of Appeals: (1) it was possible that the children might be returned home before the 15-month threshold had been met; (2) even if the children were to remain in substitute care for 15 months, it was possible that DHS would not "choose to pursue termination of parental rights at that time"; or (3) the juvenile court might determine, for a variety of reasons, that the children's permanency plans should not be changed to adoption—eliminating a prerequisite to DHS filing a petition to terminate parental rights.

In agreeing with DHS that whether it would end up filing a termination petition involved "too many variables" to prevent the case from being moot, the Court of Appeals relied on its own case law for the proposition that a collateral consequence must have a "'significant probability of actually occurring.'" *T. J. N.*, 323 Or App at 269 (quoting *Smith v. Board of Parole*, 305 Or App 773, 776, 472 P3d 805, *rev den*, 367 Or 387 (2020) ("[A] collateral consequence must have a significant probability of actually occurring; a speculative or merely possible effect is not enough." (Internal quotation marks omitted.))). But this court has never held that a case is moot unless there is a "significant probability" that a decision will have a practical effect on the parties. *See, e.g.*, *K. J. B.*, 362 Or at 785 (case moot when a decision "'will no longer have a practical effect on the rights of the parties'" (quoting *Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 358 Or 26, 30, 361 P3d 1 (2015))); *Rogue Advocates*, 362 Or at 272 (case "moot '[i]f, because of changed circumstances, a decision no longer will have a practical effect on or concerning the rights of the parties'" (quoting *State v. Hemenway*, 353 Or 498, 501, 302 P3d 413 (2013))); *see also Eastern*

on the statutory timeclock. Even now, however, DHS does not develop a statutory construction argument to support its new assertion that the appeals would have no practical effect. But this case does not require us to undertake that exercise of statutory construction independently, because our inquiry is focused on whether DHS demonstrated to the Court of Appeals that resolution of the appeals would have no practical effect on the parties. And in the Court of Appeals, DHS contended only that the practical effect was speculative.

*Oregon Mining Association*, 360 Or at 15 ("[C]ases 'in which a court's decision no longer will have a practical effect on or concerning the rights of the parties * * * will be dismissed as moot.'" (Quoting *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993).)).

Moreover, by asking whether a collateral consequence has a "significant probability" of occurring, the Court of Appeals effectively placed the burden on parents to demonstrate that the judgment *will* have a practical effect. That too is inconsistent with our case law. As we explained in *A. B.*, once "a parent identifies practical effects or collateral consequences that the parent believes will result from the judgment, * * * [t]he burden is on [DHS] to prove that a jurisdictional judgment will have no practical effect on the rights of the parties and is therefore moot." 362 Or at 414. We made a similar point in *K. J. B.*, in which we explained that we did not need to examine whether the petitioner was correct that "social stigma" was a consequence of the challenged civil commitment judgment, because the state had "simply asserted—without support of any kind—that the social stigma of which [the] petitioner [had] complain[ed] [did] not exist," which was "not adequate to establish that there [were] no collateral consequences." 362 Or at 788-89.

A comparison of the practical consequences identified in the Court of Appeals with the practical consequences identified in our other mootness decisions in the dependency context illustrates why DHS did not meet its burden by simply pointing to reasons that the identified consequence might not come to pass. For example, in *P. D.,* we recently applied the shifting-burden framework described in *A. B.* to evaluate whether the mother's appeal from dependency judgments establishing jurisdiction and wardship over her children had become moot after the juvenile court terminated its jurisdiction and the wardships during the pendency of the appeal. 368 Or at 629. We explained that the mother had "assert[ed] that the existence of a jurisdictional judgment in Oregon [would] prejudice her in any future domestic relations or dependency proceeding in California." *Id.* at 632. We observed that the mother had offered "no detailed explanation as to why that would be so," but that she had identified one California decision in which the court

had described "assertions of prejudice of the type that [the] mother [had] identified" as "highly speculative," but, nevertheless, sufficient to prevent the California appeal from being moot. *Id.* at 632-33 (internal quotation marks omitted). And we emphasized that "DHS concede[d] that it would be unable to prove that the existence of an Oregon judgment would not have collateral consequences in a future domestic relations or dependency proceeding in California." *Id.* at 632. On that record, we were not persuaded that continuing the appeal would have no practical effect on the parties' rights, and "we decline[d] to dismiss [the] mother's appeal as moot." *Id.* at 633.

We also considered whether a parent had identified collateral consequences that prevented his appeal from a dependency judgment from being rendered moot in *Dept. of Human Services v. G. D. W.*, 353 Or 25, 32, 292 P3d 548 (2012). There, the juvenile court had terminated the dependency case, but we agreed with the father's assertions that, because the challenged judgments included a finding that he had sexually abused his child, allowing that finding to remain a matter of record could "have real and adverse effects on [the] father, and that those adverse effects may be prevented if the findings are judicially overturned." *Id.* at 32. We explained that there were three potential adverse effects that could be prevented if the findings were overturned on appeal: (1) the challenged dependency judgment made it easier for the state to terminate the father's parental rights in the future; (2) because the findings "likely" caused the circuit court—in a different case—to award sole custody of the father's children to their mother, "[i]f the findings and judgments were to be vacated, [the] father's ability to reopen the custody and parenting time judgment might be positively affected"; and (3) "although perhaps not sufficient by itself," the "social stigma that [the] father suffer[ed] as a result of the judicial finding that he sexually abused his daughter [was] significant."[8] *Id.* Given our conclusion that

---

[8] We emphasized in *A.B.* that "the findings necessary to a jurisdictional judgment are not equally stigmatizing[,]" and we declined to assume that such judgments "are so inherently stigmatizing that they justify our adoption of a categorical rule" that appeals of those judgments will continue to have a practical effect "in all but extraordinary circumstances." 362 Or at 425-26.

"those adverse effects *may* be prevented if the findings are judicially overturned[,]" we concluded that the appeal was not moot. *Id.* (emphasis added).

Even in *A. B.*, we emphasized that the mother had "done what is necessary by identifying the collateral consequences that she believes she will face"—that, left to stand, the findings of neglect that supported the challenged jurisdictional judgment would disadvantage her in any future case DHS might file against her. 362 Or at 427. And we were persuaded that the case was moot because DHS had demonstrated that the finding in the challenged judgment would not be "significantly disadvantageous" to the mother. *Id.* at 427-28. As we explained, we were "persuaded that, if [DHS] considers allegations concerning [the] mother in the future, the existence of the findings and judgment [would] not be significantly disadvantageous," because DHS "would consider not only the finding that, at one point in time, [the] mother had neglected some of her parental duties, but also the findings that her child [was] 'extremely attached' to her[,]" that she "quickly took advantage of and benefitted from" services, and that the dependency case resolved early with a "finding that [DHS] had no continuing safety concerns." *Id.* at 428. Thus, our mootness case law in the dependency context does not support the Court of Appeals' conclusion that DHS could meet its burden by persuading the court that there was less than a "significant probability" that DHS would file a petition to terminate parental rights.

DHS, nevertheless, contends that the approach taken by the Court of Appeals is supported by this court's decision in *Couey*, in which we explained that, "[i]n the context of a declaratory judgment action, a justiciable controversy requires a dispute based on present facts, not facts that may or may not happen in the future." 357 Or at 470 (internal quotation marks omitted). DHS derives from *Couey* the broader proposition that "[t]he mere possibility that a decision could someday have collateral consequences is not enough to overcome mootness when the possibility is based on facts that may or may not happen in the future." (Internal quotation marks omitted.) But there is a difference between the kind of consequence identified in *Couey*, which

was so dependent on assumptions as to be merely specula-
tive, and consequences that are simply less than certain to
occur. And *Couey* does not support DHS's proposition that
both kinds of uncertainty will make an identified collat-
eral consequence legally insufficient to prevent a case from
becoming moot.

In *Couey*, the plaintiff filed an action for declaratory
relief to challenge the constitutionality of a statute that pro-
hibited a person who was registered to collect initiative peti-
tion signatures for pay from collecting "at the same time"
signatures on other petitions for which the person was not
being paid. *Id.* at 462. During the pendency of the litigation,
however, the plaintiff stopped working as a paid signature
collector, and his registration expired. *Id.* The Secretary of
State contended that, given those circumstances, the plain-
tiff's challenge to the statute had become moot. *Id.* The
plaintiff attempted to defeat that conclusion by filing an affi-
davit in which he averred that he had recently re-registered
and intended to collect signatures for pay in the next elec-
tion cycle, that he "might be willing" to collect signatures on
other petitions at the same time on a voluntary basis, and
that he "would like to have the right and freedom" to do so.
*Id.* at 466-67.

On review, we ultimately concluded that the con-
sequences that the plaintiff identified were insufficient to
prevent the case from being moot. But we first emphasized
that the question of mootness was arising in the context of
a declaratory judgment action, for which "relief is available
only when it can affect *in the present* some rights between the
parties." *Id.* at 470 (emphasis in original; internal quotation
marks omitted). We then reasoned that "[a]ny suggestion
of possible harm is a matter of no more than speculation,
depending entirely on a series of assumptions unsupported
by any evidence in the record." *Id.* at 471. And we empha-
sized why the plaintiff had failed to identify harm that could
prevent his declaratory action from being moot:

> "Giving plaintiff every beneficial inference, the best that
> the evidence shows is that, *if* plaintiff obtained employ-
> ment as a signature collector, and *if* another measure deal-
> ing with protecting the environment were filed, and *if* that

measure garnered the requisite number of sponsors, and *if* that measure obtained a certified ballot title, *then* plaintiff 'would like to support it,' presumably by collecting petition signatures on a volunteer basis.

"That is the epitome of contingent and speculative facts. There is no evidence that plaintiff is currently harmed, or even under current threat of harm[.]"

*Id.* (emphases in original).

Even assuming that the declaratory judgment standard governs the mootness determination here, the appeals before us arise in a context that makes the identified consequences qualitatively different from the unsupported "suggestion of possible harm" that we rejected in *Couey*.[9] *Id.* Once a child comes within the dependency jurisdiction of the juvenile court, "a series of complex statutes and proceedings come into play" that "seek to protect the safety and well-being of children." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 50, 430 P3d 1021 (2018); *see also* ORS 419B.090(2) - (4) (describing the statutory and constitutional rights of parents and children). Although Oregon law recognizes a "strong preference that children live in their own homes with their own families," the law also recognizes that "it is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents." *S. J. M.*, 364 Or at 50-51 (internal quotation marks omitted). In those circumstances, "the state has an 'obligation to create or provide an alternative, safe and permanent home for the child.' ORS 419B.090(5)." *S. J. M.*, 364 Or at 51. As part of that obligation, the Oregon legislature has established timelines for DHS and the juvenile court to follow in dependency cases to move children quickly toward a permanent situation. *See, e.g.*, ORS 419B.470(2) (specifying that, when a child (or ward) is in substitute care, the juvenile court must hold "a permanency hearing no later than 12 months after the ward was found

---

[9] We have never addressed whether *Couey*'s "current" harm or threat of harm standard is a requirement outside of the context of a declaratory judgment action, in which justiciability focuses on a "present" effect on rights between the parties. *See* 357 Or at 471. But we need not resolve that question here, because a shortened time in which to address parenting deficiencies before facing a termination petition is a current harm or threat of harm.

within" the court's jurisdiction or "14 months after the child or ward was placed in substitute care, whichever is the earlier"). The notable timelines that the legislature has established for dependency cases include ORS 419B.498(1), which "*requires* DHS to file a petition to terminate parental rights and proceed with adoption when a 'child or ward has been in substitute care under the responsibility of [DHS] for 15 of the most recent 22 months,' *unless* some exception applies." *S. J. M.*, 364 Or at 51 (quoting ORS 419B.498(1)(a) (emphases in original)).

Thus, unlike the plaintiff in *Couey*, who could point only to a "suggestion of possible harm" that depended "entirely on a series of assumptions unsupported by any evidence in the record," 357 Or at 471, parents in this case point to an entire statutory scheme that sets in motion certain "permanency" timelines for children who are in substitute care. There may be variables that make it impossible to predict the ultimate outcome of any particular dependency case, but there is no lack of certainty about the rules that will govern that outcome. Nor is there any dispute that one of those rules is a statutory default requirement that DHS file a termination petition once a child has been in substitute care for "15 months of the most recent 22 months," unless an exception applies. ORS 419B.498(1)(a). Under the reasoning in *S. J. M.*, when the 15-month deadline is reached, DHS must take some action with regard to termination—as pertinent here, DHS "shall file" a TPR petition unless, among other things, "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward." ORS 419B.498(2). That clock, in turn, sets a limit on the time that parents can count on having to address their parenting deficiencies so that their children can safely return home. Those are consequences for the parties, despite the fact that there are statutory exceptions or conditions that mean DHS might not file the termination petitions. *See A. B.*, 362 Or at 427 (following approach of asking whether parents have "raised the potential for continuing practical effects and collateral consequences" and, if so, whether DHS is able to "persuade us that those effects and consequences were factually incorrect or legally insufficient").

Thus, we agree with parents that the Court of Appeals erred in concluding that DHS had met its burden to prove that parents' appeals were moot. But that does not end our analysis of mootness in this case.

B.  *Whether the Case Is Now Moot*

As we noted at the outset, while the appeals were pending in this court, the juvenile court terminated wardship and dismissed the underlying dependency cases. DHS contends that those judgments further cut off any practical effect to resolving this appeal, because parents effectively have been granted the relief that they seek: the children are in their parents' custody and are no longer wards of the court at all. And parents do not dispute that, at least in this court, the subsequent judgments mean that addressing the original substitute-care placements will have no direct practical effect on the parties.

But, as emphasized above, dismissal of an underlying dependency petition "'does not necessarily render'" moot the appeal from a judgment entered during the course of the dependency case, if the parents identify collateral consequences of the challenged judgment that would have a practical effect on their rights. *P. D.*, 368 Or at 632 (quoting *A. B.*, 362 Or at 414). Here, parents and the children suggest different approaches to the question of whether the dismissals in this case might, nevertheless, leave collateral consequences to the original substitute-care placement determination that would prevent the appeals from being moot. Parents assert that, to the extent that ORS 419B.498(1)(a) refers to 15 of the most recent 22 months in an *ongoing* dependency case, the dismissal of the cases renders the appeals moot. That implies a question about whether dismissal of dependency petitions always will eliminate that collateral consequence, and children, in fact, argue that the plain text of the 15-month rule in ORS 419B.498(1)(a) does not require that "those months occur during a single dependency case." Nonetheless, children acknowledge that the judgments in these cases "confirm that the children have now been in a parent's care" for long enough that the original, challenged three-months in substitute care would not cause the children to reach the threshold of "'15 of the most recent 22

months' in substitute care that would trigger the mandate of ORS 419B.498." Given the present circumstances and the arguments of the parties in this court, we conclude that no party has identified collateral consequences that would have a practical effect on the parties and prevent these appeals from now being moot.

Parents, nevertheless, urge this court to exercise our discretion under ORS 14.175 to consider their challenges to the judgments of the juvenile court and to the mootness ruling of the Court of Appeals. That statute provides:

"In any action in which a party alleges that an act, policy or practice of a public body, as defined in ORS 174.109 * * * is unconstitutional or is otherwise contrary to law, the party may continue to prosecute the action and the court may issue a judgment on the validity of the challenged act, policy or practice even though the specific act, policy or practice giving rise to the action no longer has a practical effect on the party if the court determines that:

"(1) The party had standing to commence the action;

"(2) The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect; and

"(3) The challenged policy or practice, or similar acts, are likely to evade judicial review in the future."

The decision to address the merits in a moot case under ORS 14.175 is a discretionary one. As we explained in *Couey*, the statute "leaves it to the court to determine whether it is appropriate to adjudicate an otherwise moot case under the circumstances of each case." 357 Or at 522; *see also Penn v. Board of Parole*, 365 Or 607, 613, 451 P3d 589 (2019) ("[C]ourts are not *required* to decide any and every moot case that falls within the terms of ORS 14.175." (Emphasis in original.)).[10]

---

[10] We have previously noted that "ORS 14.175 may not represent 'the full scope of a court's constitutional authority to decide moot cases.'" *Woodland*, 371 Or at 336 n 2 (quoting *Penn*, 365 Or at 613 n 2). Although parents argue that we have "inherent authority independent of ORS 14.175 to decide a moot case under the capable of repetition doctrine even without a statutory basis," we conclude, as we did in *Penn*, that "there is no need to look beyond ORS 14.175 for authority to decide" parents' appeal. 365 Or at 613 n 2.

Here, even if we assume that ORS 14.175 gives this court authority to address parents' arguments about the validity of the juvenile court's judgments changing their children's placement preference to substitute care, we would decline to exercise our discretion to do so. Parents contend that the merits of their challenge to the original substitute-care placement presents such an important question about whether the juvenile court applied the correct statutory standard that this court should decide it in the first instance, but we are not persuaded. In seeking review, parents urged this court to hold that the Court of Appeals erred in dismissing the appeals as moot. We granted the petitions for review to address that question, and we have now held that the Court of Appeals erred in dismissing the appeals. Had the cases not become moot for other reasons, we would have remanded for the Court of Appeals to address the merits of these appeals. But the cases are now moot, and we leave the parties' novel questions of statutory construction to a future case in which those questions can be resolved in the first instance by the Court of Appeals.

The decision of the Court of Appeals is reversed. The appeals are dismissed.